**SEALED AIR CORPORATION,**
Appellant,

v.

**U. S. INTERNATIONAL TRADE COMMISSION, Polybubble, Inc., Tong Seae Industrial Co., Ltd., Appellees.**

**UNIPAK (H.K.) LTD., Appellant,**

v.

**U. S. INTERNATIONAL TRADE COMMISSION, Sealed Air Corporation, Appellees.**

Appeal Nos. 79–35, 80–4.

United States Court of Customs and Patent Appeals.

March 12, 1981.

Lawrence I. Lerner, Westfield, N. J., and Harvey Kaye, Washington, D. C., for Sealed Air.

Glen R. Grunewald, Oakland, Cal., for Tong Seae.

N. Tim Yaworski and Michael H. Stein, Washington, D. C., for I. T. C., in 79–35 and 80–4.

Peter W. Gowdey, Michael L. Keller, W. S. Graham Welton, pro se, for UNIPAK, in 80–4.

Before MARKEY, Chief Judge, and RICH, BALDWIN, MILLER and NIES, Judges.

MARKEY, Chief Judge.

This is a consolidated appeal from the June 29, 1979 determination of the United States International Trade Commission (ITC) terminating investigation No. 337–TA–54, "Certain Multicellular Plastic Film" (film). All respondents save one were found in violation of section 337 of the Tariff Act of 1930, as amended by the Trade Act of 1974, by reason of the importation of the film into, or its sale in, the United States. We affirm.

## Background

On May 12, 1978, Sealed Air Corporation (Sealed Air) filed a complaint with the ITC, alleging violations of Section 337 of the Tariff Act of 1930, as amended (19 U.S.C. § 1337), by the importation into the United States, or subsequent sale, of film manufactured in a foreign country by processes that allegedly infringed method claims 1 and 2 of U. S. Letters Patent 3,416,984 ('984).

After a January 1979 evidentiary hearing, a Commission Administrative Law Judge (ALJ) concluded that the claims were invalid under 35 U.S.C. § 103 and recommended that no violation of 19 U.S.C. § 1337 be found. The ALJ determined that the ITC had jurisdiction over all respondents.

Manufacturers named and served were: Tong Seae Industrial Co., Ltd. (Tong Seae) of Taiwan; Conform Plastics Ltd. (Conform) of New Zealand; and Unipak (H.K.) Ltd. (Unipak) of Hong Kong. Importers named and served were Polybubble, Inc. (Polybubble) and Peter Darlington, d/b/a Solar Pool Covers (Darlington).

Unipak neither answered the complaint nor participated in discovery. Conform filed a response but did not participate in discovery or in the hearing. Darlington participated in discovery but not in the hearing. Neither Conform nor Darlington is represented in this appeal.

A June 26, 1978 mailing of the complaint and other papers by the ITC to Unipak resulted in a return receipt stamped July 6, 1978. Unipak admittedly received Sealed Air's request for discovery and declined to participate. Four shipments of film into the United States were made by Unipak, with Polybubble as the importer.

On December 7, 1978, upon motion by Sealed Air, the ALJ issued Order No. 6, finding Unipak in default and ruling that "without further notice to Unipak, the facts may be found to be as alleged in the complaint and notice of investigation."

The Commission: (1) reversed the ruling of invalidity; (2) found Tong Seae's process non-infringing; and (3) sustained the finding of jurisdiction with respect to Unipak. Conform and Unipak were found to have infringed claims 1 and 2 of the '984 patent. All respondents except Tong Seae were held in violation of 19 U.S.C. § 1337.

Polybubble, as an importer of Unipak's products, and Tong Seae challenge the ruling that the '984 patent is valid. Sealed Air challenges the determination of non-infringement by Tong Seae. Unipak challenges the determination that it is subject to the jurisdiction of the ITC.[1]

## Issues

(1) Would the subject matter of claims 1 and 2 of the '984 patent have been obvious to one of ordinary skill in the art at the time the invention was made?

(2) Was the determination that Tong Seae's extrusion process does not infringe claims 1 and 2 of the '984 patent erroneous?

(3) Did the ITC have jurisdiction to exclude Unipak's product?

### (1) Validity of Claims 1 and 2

#### (a) The Invention

The '984 patent discloses and claims a process for manufacturing film. Two

1. The finding of infringement by Conform is not challenged on this appeal. Unipak's brief argues non-infringement, but that issue is not before us. The standing of the parties to present arguments on the validity of the '984 patent is fully described in this court's review of Sealed Air's Motion to Dismiss and Strike portions of a separate appeal, reported as *Tong Seae Industrial Co., Ltd., et al. v. USITC, et al.*, CCPA, decided January 7, 1980. Upon stipulation of the parties, that appeal was dismissed in favor of the present appeal.

sheets of polyethylene are so heated, shaped, and bonded together as to form numerous air-tight cells. The resulting cushioning and insulating properties make the product useful as packaging material and as covers for swimming pools.

In the '984 process, two sheets of film are separately heated. One sheet (the embossed film) is heated to a low temperature sufficient to render it deformable by vacuum drawing into the cavities of an embossing roller to form numerous discrete embossments. The second sheet (the laminating film) is heated to about the fusion temperature with at least one surface above the fusion temperature, and then applied to the now embossed surface of the embossed film while the latter is still on the embossing roller. During their mating, transfer of heat from the laminating film to the embossed film seals the two films to form a product having numerous airtight cells.

Unlike prior art techniques, the '984 process employs a cooler embossed film and a hotter laminating film. It had previously been thought that effective sealing required the mating surfaces of both films to be at or above the fusion temperature[2] at the "kiss point," where the embossed film contacted the laminating film. The problem was that when the embossed film was heated to fusion temperature, it became so soft and weak that individual embossments often ruptured when subjected to vacuum during their formation. The solution to that problem disclosed in the '984 patent is to so increase the temperature of the contact surface of the laminating film as to allow a reduced temperature of the contact surface of the embossed film, thus permitting vacuum embossment without rupture, and to transfer the excess heat from the laminating film to the embossed film at the kiss point, thus equalizing the temperatures of both films at or above the fusion temperature and producing an effective heat seal between them.

Claims 1 and 2 of the '984 patent read:

1. The method of making cellular material comprising the steps of embossing a first heated sheet of plastic material having thermoplastic properties, said sheet having been heated on one side to about its fusion temperature, said embossments extending from the other side of said sheet, reducing the temperature on the other side of said sheet below the embossing temperature immediately after embossment thereof, heating a second sheet of plastic having thermoplastic properties to about the fusion temperature with at least one surface above the fusion temperature, feeding said one side of said second sheet into contact with said one side of said embossed sheet while above the fusion temperature to seal the embossments therein, said one surface of said second sheet transferring heat to said one side of said first sheet to equalize the temperatures of the meeting surfaces of said sheets at a temperature at least equal to the fusion temperature.

2. *The method of making a cellular material according to Claim 1 including the steps of cooling the other side of said first sheet immediately upon embossment thereof and then cooling said sheets to permanently seal them one to the other.*

#### (b) *Validity*

■ Analysis of validity under 35 U.S.C. § 103 requires determination of the scope and content of the prior art, ascertainment of differences between the prior art and the invention claimed, and resolution of the level of ordinary skill in the art. *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966).

The principal prior art reference is U.S. patent No. 3,142,599 (Chavannes I) assigned to Sealed Air.[3] Chavannes I discloses a

---

2. That temperature at which the mating surfaces of two film so melt together that there is no distinguishable interface between them.

3. Chavannes is co-inventor with Fielding on the '984 patent and on U.S. Patent No. 3,208,-

898 (Chavannes II), both assigned to Sealed Air. Chavannes and Fielding are co-founders of Sealed Air Corp., of which Fielding is a director. Fielding testified before the ALJ *on* the making of the invention, the prior art, and commercial success.

process of embossing a heated film and applying a heated laminating film to the embossments, and, as in the '984 patent, employs low density polyethylene films having a narrow temperature band in which embossing may be performed. The minimum embossing temperature[4] and the melting temperature[5] are separated, dependent on the characteristics of the film selected, by as little as ten to twenty degrees. The embossing temperature is between 218 and 226°F and the melting temperature is between 225 and 230°F.[6] The fusion temperature is between 214 and 222°F.

Chavannes I teaches that both films should be so heated that their mating surfaces will be at fusion temperature at the kiss point. Both films were processed in Chavannes I at a temperature considered very close to their upper limits, and the embossed film remained susceptible to ruptured embossments. Though the surface of the embossed film in contact with Chavannes' cool embossing roller lost heat, Chavannes taught maintenance of its opposite or "mating" surface at the fusion temperature or greater. The film being relatively thin (1–5 mils), each of its surfaces is affected by temperature changes on the opposite surface. Extreme care was necessary with the Chavannes I process in attempting to minimize the tearing effect of embossment by keeping one surface of the embossed film as cool as possible, while simultaneously, and directly contra the teachings of the '984 patent, maintaining the opposite mating surface at fusion temperature.

Though claim 1 of the '984 patent speaks of initially heating the mating surface of the embossed film to about its fusion temperature, the cooling step of that claim reduces that temperature below the fusion level; next, at the kiss point, the surface of the embossed sheet is brought up to fusion temperature. Nothing in Chavannes I discloses or suggests the steps of the asserted claims in which the mating surface of the embossed film is cooled and sealing is accomplished through heat transfer from the laminating layer.[7]

Chavannes and Fielding obtained a patent (Chavannes II) on "Apparatus For Embossing And Laminating Material",[8] relating to fabrication of film. Chavannes II discloses a cooling means within the embossing roller, to cool and thus strengthen the embossments as they are formed. Insulating means on the roller are also disclosed, however, to shield the mating surface of the film from the effect of the cooling means, so that the mating surface may be maintained, as in Chavannes I, at fusion temperature. While Chavannes II teaches means to lower the temperature of one surface of the embossed film, its teaching of means to maintain a high temperature of the mating surface is contrary to the process steps of the asserted claims by which the latter temperature is reduced below fusion temperature.

Chavannes II also discloses a three-film lamination in which a third layer is heated to near its melting point and placed over the salient portions of sealed cells, to transfer sufficient heat from the third layer to form a "firm joinder."

4. That temperature at which the film to be embossed is sufficiently soft to be readily deformed by application of vacuum and keep its deformed shape upon cooling.

5. That temperature at which the stretched film loses its dimensional stability.

6. Sealed Air says in a reply brief that the embossing temperatures may be substantially higher than the 218–226°F range. That statement conflicts with the asserted advantage in a low embossing temperature and with Fielding's

testimony that the same film in the process of Chavannes I "just self destructs" when heated above the melting temperature.

7. The commission held that British patent No. 908,579 to Bingham duplicates the disclosure of Chavannes I. The Bingham patent is not discussed by the parties on this appeal.

8. U.S. Patent No. 3,208,898, filed Mar. 9, 1960, issued Sept. 28, 1965, assigned to Sealed Air Corporation.

Sealed Air says: (1) Chavannes II discloses only a tack seal,[9] not the complete hermetic seal of the '984 patent; (2) Chavannes II is not a valid reference because it issued to the same inventors after the filing date of the application on which the '984 patent issued; and (3) there is no evidence that the three layer, heat transfer embodiment was used or known by others before the filing date of the '984 patent.

Tong Seae and Polybubble point to Fielding's testimony to support their contention that the three layer, heat transfer embodiment was known in the art. Fielding, however, testified that that embodiment produced a peelable, tacking seal. Thus the only evidence of record supports Sealed Air's position on the nature of the Chavannes II seal. Though Fielding referred to his experience, nothing of record indicates the nature of that experience, or whether it involved actual use of the three layer embodiment, or whether it occurred before or after the filing date of the '984 patent. Consequently, respondents have not sustained their burden of proof, having failed to demonstrate that the teachings of Chavannes II were known to others before the filing date of the '984 patent. 35 U.S.C. § 102(a). Hence, Chavannes II has not been shown to be a valid reference.

■ The scope and content of the prior art contain nothing to suggest the differences disclosed in the claimed invention, and the level of skill reflected in the record did not rise to a point at which it can be said that the process of claims 1 and 2 as a whole would have been obvious to one skilled in the art at the time the invention was made. No reference discloses or suggests the steps of lowering the temperature of an embossed film sheet, increasing the temperature of a laminating film sheet, and transferring heat between their mating surfaces to hermetically bond them. Accordingly, we affirm the determination of the ITC that claims 1 and 2 of the '984 patent are valid.

9. A tack seal has been described as a seal which could easily peel apart due to failure to

(2) *Infringement*

In the Tong Seae process, polyethylene is heated to about 540°F and extruded as a hot liquid directly onto an embossing roller. The embossing roller is extensively cooled by refrigerated air and water. A fine mesh screen underlies each roller cavity to prevent molten polyethylene from being drawn through the cavity by the applied vacuum and is also chilled by refrigerated air and water. The extruded liquid film, upon contacting the roller surface, inner cavity walls, and mesh screens, is cooled to solidification. The laminating film is also extruded as a hot (about 540°F) liquid and brought into contact with the embossed film after the embossments are formed. The two films, while still on the embossing roller, then pass through a pool of chilled water to solidify the seal between them.

Sealed Air's expert witness, Buckley, having viewed the Tong Seae process and taken temperature readings, said that the temperature of the embossed film fell well below the fusion temperature after embossment. Because a bond was formed between the two films, says Buckley, heat transfer from the laminating film must have occurred.

It is undisputed that the Tong Seae process does not literally infringe claims 1 and 2 of the '984 patent. Those claims specify the heating of pre-formed plastic sheets. The Tong Seae process forms the film product from molten plastic extruded directly onto an embossing roller. Sealed Air therefore relies on the doctrine of equivalents. Claim limitations to heating the embossed sheet and one side of the laminating sheet to about the fusion temperature are to be viewed, says Sealed Air, as energy efficient steps in a reheating process, and should not be rigidly read as critical temperature controls. Also, says Sealed Air, the recited temperature limitations merely relate to the "best mode" of carrying out the broad "inventive concept" of lowering the embossed film temperature to prevent rupturing, and holding the laminating film suffi-

completely bring the interface of the films to the fusion temperature.

ciently above fusion temperature to bring the mating surfaces to at least the fusion temperature.

■ Equivalence is determined against the context of the patent, the prior art and the particular circumstances of the case. *Graver Tank & Mfg. Co., Inc. v. Linde Air Products*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950), 7 Deller's Walker on Patents § 546 (2d Ed. 1972). A finding of equivalence or non-equivalence is one of fact. *Parmelee Pharmaceutical Co. v. Zink*, 285 F.2d 465, 128 USPQ 271 (CA8 1961). That finding will not be disturbed unless clearly contrary to the weight of the evidence. *Solder Removal Co. v. ITC*, 582 F.2d 628, 199 USPQ 129 (Cust.& Pat.App.1978).

■ For an accused process to infringe under the doctrine of equivalents, it must employ substantially the same means, to achieve substantially the same results, in substantially the same way, as the patented process. *Graver Tank & Mfg. Co., Inc. v. Linde Air Products*, supra, 339 U.S. at 608, 70 S.Ct. at 856. The Commission concluded, and we agree, that present here are substantially the same means (thermoplastic material, vacuum embossing, and heat), and substantially the same result (the manufacture of the film without rupture of cells), but absent is the achievement of that result in substantially the same way. Unlike the Tong Seae process, the patented process depends for success upon careful control of film temperature before and during embossment and lamination.

Fielding's testimony that laminating film would "self destruct" if heated above melting temperature, undercuts Sealed Air's position that a process employing molten laminating film at hundreds of degrees above melting temperature represents an equivalent of its process employing pre-formed sheets heated below melting temperature. Moreover, Tong Seae's process step of rapidly cooling down from hundreds of degrees is distinct from the very narrow range operation of the '984 process. Further, it is incongruous for Sealed Air to argue that its

process is not dependent on close control of temperatures in light of the '984 disclosure treating sides of a very thin sheet at different temperatures within very narrow ranges.

The ITC noted portions of the '984 specification, attorney's comments during prosecution of the '984 patent, and testimony of Fielding, all describing the necessity of bringing the two sides of two films, or portions thereof, to a specific temperature or temperature range at various points in the '984 process. Referring to the language of the claims, the ITC concluded that the Tong Seae extrusion process neither depends upon the temperature control technique of, nor operates in "substantially the same way" as, the patented process.

Sealed Air, in its brief says ITC relied on portions of the record that relate more to the state of the art prior to introduction of the '984 process, which, says Sealed Air, reduced dependency upon rigid temperature control by eliminating the requirement of the Chavannes I process that the mating surface of the embossed film be maintained at or above fusion temperature. The '984 process is, however, dependent upon maintaining pre-fabricated sheets within a narrow temperature range. Moreover, the thermal characteristics of the polyethylene material dictate that film be cool enough to enable reliable embossment; that mating surfaces be at fusion temperature to effect sealing, and those parameters are fixed whether the process be one of reheating or extrusion. Sealed Air's patent claims 1 and 2 cannot be read to encompass all embossing and sealing processes operating within those inherent temperature confines.

■ A pioneer invention, performing a function never before performed, is entitled to liberal application of the doctrine of equivalents. *Morley Machine Co. v. Lancaster*, 129 U.S. 263, 9 S.Ct. 299, 32 L.Ed. 715 (1889); *Parmelee Pharmaceutical Co. v. Zink*, supra. The '984 patent, however, discloses a process earlier performed, that is,

the production of multicellular film by heating, vacuum embossing and sealing. Sealed Air is entitled to protection of its claimed improvement of the process, but others are entitled to practice variations of the old process, so long as those variations differ from and do not include that of the '984 patent. *Universal Oil Products Co. v. Globe Oil & Refining Co.*, 322 U.S. 471, 64 S.Ct. 1110, 88 L.Ed. 1399 (1944); See *Coleco Industries, Inc. v. I. T. C.*, 65 CCPA 105, 573 F.2d 1247, 197 USPQ 472 (CCPA 1978).

■ Nor is equivalence established by showing accomplishment of the same result. The test is whether the claimed method in all substantial aspects has been followed. *U. S. Rubber Co. v. General Tire and Rubber Co.*, 128 F.2d 104, 53 USPQ 444 (CA6 1942). Sealed Air has not met that test.

■ Sealed Air's contention that claims 1 and 2 merely set forth the "best mode," and should be interpreted to encompass processes employing the "inventive concept" of heat transfer between film mating surfaces, is without merit. It is axiomatic that the claims measure the invention,[10] and courts may neither add to nor detract from a claim. *Cimiotti Unhairing Co. v. American Fur Refining Co.*, 198 U.S. 399, 25 S.Ct. 697, 49 L.Ed. 1100 (1905); *Ohio Citizens Trust Co. v. Lear Jet Corp.*, 403 F.2d 956, 160 USPQ 11 (CA 10 1968). Sealed Air's attempt to substitute an "inventive concept" for the invention set forth in the claims is tantamount to claiming infringement based on a function or result; abstractions cannot be patented. *Westinghouse v. Boyden Power Brake Co.*, 170 U.S. 537, 18 S.Ct. 707, 42 L.Ed. 1136 (1898); *Nelson v. Batson*, 322 F.2d 132, 138 USPQ 552 (CA9 1963).

■ We affirm the determination of the ITC that claims 1 and 2 of the '984 patent are not infringed by the Tong Seae process.

### (3) *Jurisdiction*

Unipak having failed to respond to the complaint, and having refused to participate in discovery, the ITC entered an order excluding the relevant products of Unipak from entry into this country. Unipak has appealed, asserting that it was given inadequate notice of the investigation and had insufficient contacts with the United States to support the jurisdiction of the ITC. That assertion is based on an incorrect view of the nature of ITC's jurisdiction.

■ The order was not entered against Unipak personally. The sole effect upon Unipak is that the relevant product cannot be imported into the United States until it is established that it has not been made by the patented process. The order is directed against, and only against, certain "multicellular plastic material manufactured abroad in accordance with the process disclosed by claims 1 and 2 of U.S. Letters Patent 3,416,984."[11] An exclusion order operates against goods, not parties. Accordingly, that order was not contingent upon a determination of personal or "*in personam*" jurisdiction over a foreign manufacturer. The Tariff Act of 1930 (Act) and its predecessor, the Tariff Act of 1922, were intended to provide an adequate remedy for domestic industries against unfair methods of competition and unfair acts instigated by foreign concerns operating beyond the *in personam* jurisdiction of domestic courts. *See, In re Orion Co.*, 22 CCPA 149, 163, 71 F.2d 458, 467, 21 USPQ 563, 571 (1934). Authority to provide such remedy is grounded in Congress' plenary constitutional power to regulate foreign commerce, a portion of which power Congress delegated

10. Sealed Air's reliance upon *Smith v. Snow*, 294 U.S. 1, 55 S.Ct. 279, 79 L.Ed. 721 (1934), is misplaced. In *Smith*, the Supreme Court stated:

"We may take it that, as the Statute requires, the *specifications* just detailed show a way of using the inventor's method, and that he conceived that particular way described was the best one. But he is not confined to that

particular mode of use since the *claims* of the patent, not its specifications, measure the invention." (Emphasis ours.)

11. Presumably, the ITC meant to refer to the process encompassed by, or set forth in, or defined by claims 1 and 2, the function of claims being to define the metes and bounds of the claimed invention. Disclosure is the function of the entire specification.

to the ITC under 19 U.S.C. § 1337.[12] That Congress has wide discretion concerning procedures for barring imports has been judicially confirmed in numerous cases.[13]

 The ALJ and the ITC found that the ITC had *in personam* jurisdiction over Unipak. That finding was unnecessary, although there is evidence to support such a finding. The *subject matter* jurisdiction of the ITC over "the importation of articles into the United States", § 1337(a), and its authority to exclude "the articles concerned", § 1337(d), are fully adequate. Similarly, the sale in the United States of a foreign manufacturer's articles, by the "owner", "importer", or "consignee" of those articles is clearly within the subject matter jurisdiction of the ITC under § 1337(a). Hence the ITC, upon investigation and determination of a violation, could exclude products sold by a domestic owner/importer/consignee, under its subject matter jurisdiction, whether or not it named the foreign manufacturer as a respondent or gave notice to that foreign manufacturer.

 When the imported product is alleged to infringe patent claims drawn to a product, the truth of that allegation can be tested by comparison of the product with the claims. When, as here, the imported product is alleged to have been made by a process that infringes patent claims drawn to a process of making the product, determination of the literal truth of that allegation requires comparison of the process employed by the foreign manufacturer with the claims. Thus, in the former instance a product found to be itself an infringement, and all products identical to it, may be excluded, without regard to which foreign manufacturer was exporting it to the United States, and without regard to how it was made. Apparently recognizing that, in the

instance of a process claim, the personal involvement of the manufacturer and the process it employed is determinative, that is, that the same product might be made by several manufacturers employing different processes, Sealed Air named Unipak in the complaint as a respondent, and ITC sent Unipak a copy of the complaint, a notice of its investigation, a copy of its rules of practice, and other papers. Thereafter, the ITC determined that *in personam* jurisdiction over Unipak was required to support its order excluding Unipak's products.

 The ITC's mistaken belief that it required *in personam* jurisdiction was not determinative of the result, and its decision must be affirmed where the result is correct, notwithstanding its reliance on a wrong ground or a wrong reason. *SEC v. Chenery Corp.*, 318 U.S. 80, 88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1942).

In *In re Orion Co.*, supra, this court noted the broad mandate of Congress to regulate acts of importation stating:

So long as such regulation was within constitutional limitations, as we have seen it was, the wisdom of the methods provided by the Congress is a political, not a judicial, question. The importer has no right to complain as to the operation of the machinery, for the act of importation, even to our citizens, is not a vested right, but an act of grace. *Buttfield v. Stranahan*, 192 U.S. 470, [24 S.Ct. 349, 48 L.Ed. 525] (1904).

Because the Act does not require personal or *in personam* jurisdiction over a foreign manufacturer before its goods may be excluded from entry into this country, Unipak's allegations of inadequate notice and insufficient contacts are irrelevant, and its principal argument, directed solely at a jurisdictional question, must fail.

12. U.S. Constitution, Article 1, sec. 8, clause 3; see *In re Chain Door Locks*, 191 USPQ 272, 279, ITC Inves. No. 337–TA–5 (1976).

13. *See* for example, *Sugarman v. Forbragd*, 267 F.Supp. 817 (N.D.Cal.1967) aff'd 405 F.2d 1189 (CA 9 1968), which upheld the discretion given to the Secretary of Health, Education and Welfare under the Food, Drug and Cosmetic Act, 21 U.S.C. § 381(a) to bar adulterated foods without a formal hearing; see also, *The Board of Trustees of the University of Illinois v. United States*, 20 CCPA 134, T.D. 45773 (1932), aff'd, 289 U.S. 48, 53 S.Ct. 509, 77 L.Ed. 1025 (1932).

■ Though its subject matter jurisdiction is sufficient, the ITC is a creature of statute. Hence it must follow established procedures in making a determination that a violation of the Act has occurred, and may exclude a product only after completion of such procedures.

■ To enable it to carry out its duties in connection with investigations authorized by law, ITC was granted the right to summon witnesses, to take testimony, and to require the production of documents and other evidence pertaining to a pending investigation.[14] In addition, Congress authorized the ITC to adopt such reasonable procedures, rules, and regulations as it deems necessary to carry out its functions and duties.[15]

Accordingly the ITC has duly promulgated rules of practice. Rule 210.21 requires each respondent to affirmatively respond to each allegation in the complaint, and to set forth a concise statement of the facts constituting each ground of defense within twenty days from the date of service of the complaint and notice of investigation.[16] More particularly, Rule 210.21(b)(1) provides that where it is asserted in defense that an article imported or sold by a respondent is not covered by, or produced under, a process covered by the claims of a U.S. patent involved, a showing of such noncoverage for each involved claim in each U.S. patent in question shall be made by appropriate allegations.[17]

Rule 210.21(d) addresses the consequences of the failure of a respondent to comply with Rule 210.21:

(d) Default. Failure of a respondent to file a response within the time provided for in subsection (a) of this section may be deemed to constitute a waiver of its right to appear and contest the allegations of the complaint and of the notice of investigations, and to authorize the presiding officer, without further notice to that respondent, to find the facts to be alleged in the complaint and notice of investigation and to enter a recommended determination (or a determination if the Commission is the presiding officer) containing such findings.

Unipak does not contest the validity of the quoted rule provision on "Default".[18] It merely argues that petitioner offered no evidence during the investigation to establish a violation of 19 U.S.C. § 1337.

As above indicated, where, as here, the subject patent claims relate to a process and the practice of that process is not discernable from an examination of the product, cooperation of the respondent is necessary if the ITC is to carry out, in a normal manner, its mandate to investigate. ITC's obligation to conduct an investigation and to reach a determination, however, does not and cannot depend upon cooperation from named respondents. There must be, and there are, consequences attendant upon a respondent's refusal to respond.

The record establishes that Unipak denied the ITC its cooperation. Indeed, Unipak arrogantly and intransigently refused to participate in the proceeding from which it now appeals.

Unipak's response to Sealed Air's Request for Interrogatories was a letter dismissing the Interrogatories as "needlessly long, detailed and in many cases irrelevant," and announcing that such request "should be

14. 19 U.S.C. § 1333.

15. 19 U.S.C. § 1335. The stringent congressional requirement that ITC complete action on each complaint within one year, 19 U.S.C. § 1337(b)(1), makes the authority to design and adopt procedures even more critical to the ITC than might be true in agencies upon which no such deadline is imposed.

16. 19 CFR 210.21.

17. 19 CFR 210.21(b)(1).

18. 19 CFR 210.21(d). By failing to participate, Unipak forfeited its right to generate a factual record. Yet ITC must continue its investigation. § 1337(b). Sealed Air introduced evidence of infringement. Unipak introduced no evidence. Under those circumstances, Sealed Air prevails, and the "default" in 19 CFR 210.-21(d) is not a "default judgment" based on *in personam* jurisdiction. It is but a necessary procedural outcome when a respondent elects not to participate in an ITC investigation.

passed to the Hong Kong courts before requiring a Hong Kong corporation to respond." Unipak expressly refused to provide any evidence of its manufacturing process in writing. It limited its "cooperation" to an offer to testify before the ITC at a time and date "mutually convenient," *provided* that subject matter it may consider confidential would not be disclosed to Sealed Air or to the respondents, and *provided further* that it be guaranteed the total expenses it would incur in sending representatives to appear before the ITC. Unipak concluded by reserving to itself its "right" to continue exportation of its products into the U. S.

■ In view of Unipak's failure to respond to the complaint and notice of investigation, coupled with its failure to participate in discovery, the ITC was fully justified in discharging, in the only way it could, its obligation to issue a determination on whether importation and sale of Unipak's product was in violation of 19 U.S.C. § 1337. The alternative would have been to allow Unipak to frustrate the ITC's investigation, while it continued to ship its products into the U. S. to the injury of efficiently operated domestic industries. If the ITC were precluded from applying its "default" rule, when confronted with a foreign manufacturer's adamant refusal to participate, and refusal to provide indispensible evidence of noninfringement, the ITC's determination would be postponed indefinitely and the ITC would be deprived of the means to perform its functions under the statute, clearly frustrating the intent of Congress. This court can see no basis for placing that lethal weapon in the hands of foreign manufacturers.

■ Contrary to Unipak's contentions, the record establishes, prima facie, that the process employed by Unipak infringes the patented process. The allegations in the complaint concerning Unipak's process,

standing naked of answer by Unipak,[19] in whose control the evidence of its process resides, are sufficient in themselves. 19 CFR 210.21(d). In addition, the ALJ heard direct testimony of Sealed Air's expert, Fielding, based on his first-hand observations of Unipak's machinery and process.

Fielding described the embossing roller used in Unipak's machine, the nature of the cooling system as described to him by Unipak personnel, and the relative location of machinery parts, including the dies and the embossing cylinder. Fielding concluded, and explained his conclusion, that Unipak employed the heat transfer process claimed in the Sealed Air patent. He went on to estimate the capacity of the Unipak machinery.

■ Fielding might or might not have withstood rigorous cross-examination. That question is not answerable because Unipak and Polybubble, its importer, chose to forego their opportunity to cross-examine the witness or to otherwise test the credibility of the witness during the proceeding below. They cannot now do so before this court. Nor will this court evaluate the testimony or the evidence, or substitute its evaluation for that of the ITC, under such circumstances. Accordingly, we hold the ITC's determination fully supported by the record before it.

■ Having determined the existence of a violation of the law, that is, of unfair methods of competition or unfair acts in the importation of certain multicellular film products into the U. S., having the effect or tendency to destroy or substantially injure an efficient and economically operated domestic industry, the ITC was faced with two alternatives.

The ITC could exclude all such products from entering the U. S., contingent upon Unipak's or other foreign manufacturer's or the importer's petition for an ITC proceeding to determine whether entry should be

**19.** Nor did the answer filed by Polybubble respond to the allegation that Unipak's products were produced by the patented process.

allowed.[20] That remedy risked unfairness to a foreign manufacturer entitled to entry, for example, one whose process might be found non-infringing, the unfairness being denial of importation for the period necessary to make that finding.

Alternatively, the ITC could allow Unipak and other foreign manufacturers to continue to ship, and importers continue to import, all such products into the U. S. until Sealed Air could file another complaint against Unipak and new complaints against each other such foreign manufacturer or importer, the ITC could institute investigations in each case, and violations could be found. That alternative risked unfairness to American industry injured by importation during the period necessary to reach those determinations.[21]

■■■ The ITC chose to resolve the issue in favor of American business. In paragraph 3 of its Determination, ITC referred to its consideration of the effect of its Order upon the public health and welfare, competitive conditions in the United States economy, the production of like or directly competitive articles in the United States, and the interests of United States consumers. In sum, ITC determined whether the public interest lies in excluding or not excluding the goods involved. There has been no showing that the present ITC Order is in any way inconsistent with its mandate. In view of the ITC's expertise in evaluating the likelihood of injury to American business, and absent a showing of loss of pro-

tectable rights, it is not the function of a court to substitute a different remedy of its own design for that chosen by the ITC, or to substitute its view of the public interest for that of the ITC.[22]

The ITC's determination and order are affirmed.

NIES, Judge, with whom BALDWIN, Judge, joins, concurring with respect to Appeal No. 79–35 and dissenting with respect to Appeal No. 80–4.

By affirming that the Tong Seae process would not, if practiced in the United States, infringe U.S. Patent No. 3,416,984 owned by the complainant Sealed Air, this court has no alternative but to vacate the order below and remand for the ITC's determination of violation of 19 U.S.C. § 1337 based on the evidence with respect to the processes of others. An exclusion order must be supported by factual findings based on reliable, probative, and substantial evidence (5 U.S.C. § 556(d)) which establish the material facts required under 19 U.S.C. § 1337 for issuance of the order. In this case, the order is unsupported by the ITC's analysis and reliance on any evidence. In violation of the directive of the Supreme Court, every precedent as to the scope of appellate review, and without a glance at the Administrative Procedure Act, the majority substitutes its own findings to uphold the order. I respectfully dissent.

The ITC based its determination that there was a violation of 19 U.S.C. § 1337

20. The opinion (not the Order) of ITC entitles Unipak to petition for further proceedings if it should "change" its process. Unipak, apparently now willing to appear before the ITC, makes much of the word "changed", saying its existing process has never infringed and that it could not truthfully show that the process had "changed". Because its present process is in effect presumed to be one covered by claims 1 and 2 of the patent, a showing that its process is not now so covered would reflect a "change" from that presumed process, even though, as Unipak asserts, its earlier process was not so covered and it did not actually change that earlier process.

21. During the course of such investigations, ITC could allow such products of Unipak and

other foreign manufacturers to be imported under bond (19 U.S.C. § 1337(e)). The record does not reflect any effort by petitioner for further ITC proceedings or for entry under bond.

22. Nothing in the ITC Order precludes a challenge to validity of the patent or the assertion of any other defense in further proceedings. The reference to "change" of Unipak's process in ITC's opinion, see n. 19, may or may not presage denial of other defenses to Unipak in a further proceeding. Until such time as Unipak has requested such a proceeding and has been denied a defense, the question of the ITC's authority to limit defenses in such a proceeding is not before us.

(and § 1337a) in the importation of Unipak's products on findings that it had *in personam* jurisdiction over Unipak, a company located in the British Crown Colony of Hong Kong, which was sent a notice of investigation and complaint by mail, and that Unipak "defaulted" by failing to answer the complaint and "refused" to participate in discovery. Unipak challenges the determination of violation based on these findings.

The majority holds *in personam* jurisdiction over Unipak is unnecessary for the issuance of an exclusion order against its products. Disregarding the ITC's findings, the majority makes its own by relying ambiguously on Unipak's "default", Unipak's arrogance and intransigence, and interjecting its own review of the evidence concerning the Unipak process to show a prima facie case of infringement.[1] *SEC v. Chenery Corp.*, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943), relied upon by the majority, prohibits rather than endorses the substitution of the court's findings to sustain the order below.

### Unipak's Default and Intransigence

On June 26, 1978, the ITC instituted an investigation relating to multicellular plastic film used for swimming pool covers based on a complaint filed by Sealed Air, a U.S. corporation, on May 12, 1978, which named two domestic importers (Darlington and Polybubble) and three foreign manufacturers, Tong Seae (Taiwan), Conform (New Zealand), and Unipak (Hong Kong) as respondents. On June 29, 1978, the ITC sent notices of investigation with copies of the subject complaint to all named respondents. Answers were filed by all except Unipak. A receipt initialled by some unknown recipient was returned to the ITC, which indicates acceptance of the mailing to Unipak, on July 6, 1978. Unipak denies that it received these documents and alleges that the correspondence was misaddressed.

In any event, Unipak acknowledges receiving interrogatories from counsel for Sealed Air shortly thereafter and a copy of Sealed Air's "Discovery Statement."

On August 3, 1978, Unipak responded to Sealed Air with copies to all other named respondents and to appropriate persons in the ITC and other Government agencies. Unipak acknowledged receiving Sealed Air's interrogatories but denied receiving the complaint from the ITC. It questioned the authority of the ITC outside the United States. It advised that requests concerning the investigation must be processed through the Hong Kong courts. It objected to the interrogatories as needlessly long, detailed and in many cases irrelevant and refused to disclose confidential information in writing. It offered to give testimony to the ITC provided certain matters were treated confidentially and its expenses were guaranteed. It denied the allegations of the complaint "totally," and reserved its right to continue exportation of products to the U.S.A. Unipak further advised that Polybubble (a named respondent/importer) was under the duty to defend Unipak against all claims arising out of the importation of Unipak's products into the United States.

Sealed Air's counsel did not reply to this letter. However, on August 31, 1978, the attorney for the ITC undertook to do so, enclosing the complaint and a copy of the ITC rules. He advised that there were no motions regarding discovery; that Sealed Air had stated its intentions were to inspect the facilities of the foreign respondents in order to determine whether or not there was infringement of the subject patent and proposed to use an independent technical expert, qualified under a protective order in effect, to analyze technical confidential data.

He further advised that "there is presently pending a motion for default against your firm dated August 14, 1978, pursuant

---

1. Technically, the use of the process could "infringe" only if practiced in the United States. For convenience, the term "infringement" is used in this opinion in the broader sense to include practice abroad.

to Rule 210.21(d) for failure to file a response to the complaint." [2]

On October 15, 1978, Unipak acknowledged receipt (on October 12, 1978) of the August 31 letter from ITC's counsel, as well as receipt in the interim of the first mailing. Unipak continued to protest the jurisdiction of the ITC and the charge that it used the Sealed Air process in its three layer film, objected to any finding that it was in default, and again offered to cooperate in the investigation through the Hong Kong courts or before the ITC if its expenses were paid.[3]

On December 7, 1978, the Administrative Law Judge (ALJ) made the following findings:

Motion No. 54–4 is granted to the extent that the following findings are made:

1. The Commission has jurisdiction over Unipak.

2. Unipak has failed to file a response to the complaint within the time provided for in Rule 21(a) of the Commission's Rules, and is therefore found to be in default under Rule 21(d). Unipak's failure to file a response is deemed to constitute a waiver of its right to appear and contest the allegations of the complaint and of the notice of investigation. Without further notice to Unipak, the facts may be found to be as alleged in the complaint and notice of investigation, and a recommended determination may be made containing such findings.

Further findings and a recommended decision will be reserved, so that the findings relating to Unipak will not be inconsistent with the evidentiary record made in this case.

The ultimate findings by the ALJ were that the subject patent was invalid and there was, accordingly, no violation in the importation of multicellular plastic film

into the United States, but that if the patent were valid, Unipak and another foreign manufacturer, Conform, would be in violation of 19 U.S.C. § 1337 by default.

The Commission on June 29, 1979, reached a contrary conclusion as to the validity of the patent. After review of an extensive record developed by Sealed Air and Tong Seae, the Commission then determined that the extrusion process practiced by Tong Seae for making multicellular plastic film did not infringe the process covered by claims 1 and 2 of Sealed Air's patent which utilizes sheets of plastic as the starting material. Having found U.S. Patent 3,416,984 valid but not infringed by the Tong Seae process, the Commission relied upon the non-participation by Unipak and Conform for its exclusion order, making the following findings:

Specifically we find that (1) claims 1 and 2 of the '984 patent have not been shown to be invalid, (2) the processes used by respondents Conform and Unipak to manufacture multicellular plastic film abroad would, if practiced in the United States, infringe claims 1 and 2 of the '984 patent, (3) the process used by respondent Tong Seae to manufacture multicellular plastic film abroad would not, if practiced in the United States, infringe claims 1 and 2 of the '984 patent, and (4) the unauthorized importation into and subsequent sale in the United States by respondents Polybubble and Peter Darlington of multicellular plastic film manufactured abroad by Conform and Unipak has the tendency to injure substantially an efficiently and economically operated domestic industry. [Footnote omitted.]

These findings are explained in the opinion as follows:

4. *The Conform and Unipak processes infringe*

The ALJ recommended that the processes employed by Conform and Uni-

---

**2.** Although complainant's motion for default is dated August 14, 1978, it bears a filing date stamp of September 7, 1978.

**3.** 19 CFR 201.5 provides for payment of the same fees as paid to witnesses in the courts of the United States.

pak in manufacturing multicellular plastic film be found to infringe claims 1 and 2 of the '984 patent. We concur. Neither Conform nor Unipak participated in discovery. Conform was subject to evidentiary sanctions. With respect to Conform, the ALJ ruled that an inference was to be drawn that the testimony, documents, or other evidence sought from that firm by complainant would be adverse to Conform. With respect to Unipak, the ALJ ordered that without further notice to that firm, the facts could be found to be as alleged in the complaint and the notice of investigation. In view of these firms' refusal to participate in discovery and the ALJ's finding that the Commission has jurisdiction over them, we agree with the ALJ that, on the record of this investigation, the processes used by Conform and Unipak in manufacturing multicellular plastic film infringe the '984 patent.

I can see no other conclusion than that the findings of the ALJ and the ITC rest solely on the basis of an erroneous interpretation of the law, without any evaluation of the evidence.

The majority characterizes Unipak's conduct as arrogant and intransigent. I find the objections of Unipak entirely in order. Only the most formalistic tribunal would not deem Unipak's initial letter sufficient to avoid a default. Even though insufficient as a complete answer, it raised a jurisdictional defense which fairness required be ruled upon, with additional time being given for answer thereafter. Moreover, in view of our treaty obligations with Hong Kong,[4] the holding of *in personam* jurisdiction would have required taking into account the time periods and service requirements under the Treaty, before default sanctions can be imposed.

Finally, the answer filed by Unipak's importer, the person who was actually found in violation of the statute, could also have been deemed an adequate answer with respect to Unipak products since, as the majority points out, the order operates against products, not persons. This court has previously held that a named respondent *who is not an owner, importer, or consignee* and whose interests are represented by another party to the proceeding, may be excluded involuntarily from participation in an ITC investigation even though it may be adversely affected by the order. Such person is not a necessary party. *Import Motors Ltd. v. U.S. International Trade Commission*, 63 CCPA 57, 530 F.2d 940, 188 USPQ 491 (1976). No attack has been made on the answer of the importer of Unipak's products, and no finding was made that Unipak is an importer, owner, or consignee. Further, the Commission was fully advised of the relationship between Polybubble and Unipak. With respect to Unipak's products, therefore, unless the proceeding is *in personam*, as the ITC held, an answer as to Unipak's products has been made.[5]

The reliance by the Commission (but not the ALJ) and the majority on Unipak's alleged "refusal" to participate in discovery is to me anomalous. Without knowledge as to what was asked in the interrogatories, what facts are being inferred? Even with respect to this "misconduct", Unipak did not fail to respond but rather objected to the interrogatories, the most standard response. Further, no evidentiary sanctions flow automatically from an objection or even from completely ignoring a set of interrogatories. Were that the case, trial court dockets would be relatively clear. It is incumbent upon the proponent under the

---

4. Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents, 20 UST 361.

5. The majority interjects its view that the importer's answer may be treated as insufficient, in order to justify disregarding its effect in this proceeding, notwithstanding that the pleadings therein parallel those in the Tong Seae answer. Further, the majority's view that the pleadings

in the complaint concerning Unipak's process are in themselves sufficient to make out a prima facie case ignores that the pleadings are wholly conclusory, not factual. The allegations of the complaint are that all commercially feasible processes for making multicellular plastic film infringe Sealed Air's patent, a position rejected by this court in the companion appeal.

ITC rules to seek an order compelling discovery.[6] Only if that is granted and ignored may the ALJ choose among the various sanctions which it is authorized to impose. None was asked for here, and none issued.

The majority views Unipak's actions as frustrating the ITC and sees no reason to place this "lethal weapon in the hands of a foreign manufacturer." I cannot find the smoking gun. The lack of cooperation of a named respondent does not render the complainant nor the ITC impotent. Nor does it relieve the ITC from the requirements of the Administrative Procedures Act (APA), 5 U.S.C. § 556(d), that an order must be supported by reliable, probative, and substantial evidence.[7] Evidence could have been sought from Unipak as a third party witness by deposition or letters rogatory.[8] I do not find it places too great a burden on a complainant to have to obtain evidence in order to be entitled to the sweeping relief afforded by an exclusion order. The rights being enforced here are essentially private rights. If the complaint shows that the matter is of sufficient public interest, the ITC can assist by obtaining evidence on its own.

It is apparent from the ITC's above-quoted letter to Unipak that the complainant was fully prepared to proceed with obtaining evidence in Hong Kong. The ALJ's holding of in personam jurisdiction and infringement by default early in the proceedings made that unnecessary. This ruling, subsequently adopted by the Commission, was determinative of the outcome. The majority's statement that it was not is contradicted not only by the record but also by its own opinion.

The majority does not answer the issue raised by this appeal, namely, whether the ITC has in personam jurisdiction over Unipak, ruling instead that that determination is irrelevant. I agree that in personam jurisdiction is irrelevant to the power of the ITC to issue exclusion orders affecting Unipak's products, but it is not irrelevant to the findings which were advanced to support the order in this case. It is critical. In my view the ITC's interpretation of its authority is clearly in error and the majority's sanction of the result of the proceedings below violates fundamental precepts of administrative law.

*The ITC's Investigative Authority*

The ITC, like any other administrative agency or board, is entirely the creature of statute. *Civil Aeronautics Board v. Delta Air Lines, Inc.*, 367 U.S. 316, 81 S.Ct. 1611, 6 L.Ed.2d 869 (1961); *Soriano v. United States*, 494 F.2d 681 (CA 9 1974). Any authority delegated or granted to an administrative agency is necessarily limited to the terms of the delegating statute. As Chief Justice Warren said in *Civil Aeronautics Board, supra*, 367 U.S. at 322, 81 S.Ct. at 1617, "[T]he determinative question is not what the Board thinks it should do, but what Congress has said it can do."

The Government and Sealed Air in their briefs on appeal, and the ALJ who made the recommendation for the finding of *in personam* jurisdiction adopted by the ITC, do not look to the statute as the jurisdictional base, but find, under the precedent of *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), that the assertion of *in personam* jurisdiction over Unipak would not violate basic principles of due process because Unipak can be found to have had "sufficient minimum contacts" with the United States. In *International Shoe*, there was no question that the court of the forum had *by statute* been given such jurisdiction. The question was whether the jurisdictional *statute* violated due process requirements. *International Shoe* thus provides a test, not a grant, of authority. For authority, we must look to the statute.

---

**6.** 19 CFR 210.36.

**7.** ITC has subsequently recognized this requirement in *In re Certain Rotary Scraping Tools*, 208 USPQ 356 (1980).

**8.** The Hague Convention on the Taking of Evidence Abroad, 23 UST 2555, would have assisted complainant.

In the proceeding under review, the ITC is acting pursuant to 19 U.S.C. §§ 1337 and 1337a, the provisions of which are set out in the footnote.[9]

In addition, general provisions applicable to all types of proceedings before the ITC and pertinent here are found in 19 U.S.C. §§ 1331, 1333, and 1335.[10]

No provision can be found in any grant of power to the ITC for *service* of a complaint and notice of investigation in a § 1337 investigation, the type of provision which indicates "*in personam*" jurisdiction. Nor is a named respondent required by the statute to answer.[11] That most may choose to do so in order to influence the outcome of the investigation may well be likely, but the consequences of failing to answer under the ITC's own rules is not a "default" judgment but the waiver of a right to participate.[12] The rule prevents one from attempting to enter the proceedings at a later date. It

9. To avoid confusion, one must note that 1337(a) and 1337a are separate sections of the statute.

§ 1337
(a) Unfair methods of competition and unfair acts in the importation of articles into the United States, or in their sale by the owner, importer, consignee, or agent of either, the effect or tendency of which is to destroy or substantially injure an industry, efficiently and economically operated, in the United States, or to prevent the establishment of such an industry, or to restrain or monopolize trade and commerce in the United States, are declared unlawful, and when found by the Commission to exist shall be dealt with, in addition to any other provisions of law, as provided in this section.
(b)(1) The Commission shall investigate any alleged violation of this section on complaint under oath or upon its initiative.

* * * * * *

(c) The Commission shall determine, with respect to each investigation conducted by it under this section, whether or not there is a violation of this section. Each determination under subsection (d) or (e) of this section shall be made on the record after notice and opportunity for a hearing in conformity with the provisions of subchapter II of chapter 5 of Title 5. All legal and equitable defenses may be presented in all cases. Any person adversely affected by a final determination of the Commission under subsection (d), (e), or (f) of this section may appeal such determination to the United States Court of Customs and Patent Appeals. Such court shall have jurisdiction to review such determination in the same manner, and subject to the same limitations and conditions, as in the case of appeals from decisions of the United States Customs Court.
(d) If the Commission determines, as a result of an investigation under this section, that there is violation of this section, it shall direct that the articles concerned, imported by any person violating the provision of this section, be excluded from entry into the United States, unless, after considering the effect of such exclusion upon the public health and welfare, competitive conditions in the United States economy, the production of like or directly competitive articles in the United States, and United States consumers, it finds that such articles should not be excluded from entry. The Commission shall notify the Secretary of the Treasury of its action under this subsection directing such exclusion from entry, and upon receipt of such notice, the Secretary shall, through the proper officers, refuse such entry.

* * * * * *

§ 1337a
The importation for use, sale, or exchange of a product made, produced, processed, or mined under or by means of a process covered by the claims of any unexpired valid United States Letters Patent, shall have the same status for the purposes of section 1337 of this title as the importation of any product or article covered by the claims of any unexpired valid United States Letters Patent.

10. Section 1331(d) provides that the Commission may prosecute any inquiry anywhere in the United States or in any foreign country. Section 1333 provides for subpoena of witnesses and documents. Section 1335 authorizes the adoption of reasonable rules and regulations.

11. Cf. 15 U.S.C. § 45(b) and (f) for statutory authorization of this kind and Justice Brandeis' comparison of statutory requirements for answer relating to the FTC and to the ICC in *Federal Trade Comm. v. Klesner,* 280 U.S. 19, at 25–27, 50 S.Ct. 1, at 2–3, 74 L.Ed. 138 (1929).

12. 19 CFR 210.21(d):
(d) *Default.* Failure of a respondent to file a response within the time provided for in subsection (a) of this section may be deemed to constitute a waiver of its right to appear and contest the allegations of the complaint and of the notice of investigation, and to authorize the presiding officer, without further notice to that respondent, to find the facts to be as alleged in the complaint and notice of investigation and to enter a recommended determination (or a determination if the Commission is the presiding officer) containing such findings.

must be kept in mind that the ITC does not issue a "Summons" to bring parties before the tribunal; it issues a "Notice" to satisfy due process requirements. The concepts are fundamentally different.

The absence of legislative authorization for *in personam* jurisdiction cannot be treated as a mere inadvertence. A commission can function which has been given no more than a mandate to investigate into certain subject matter and must rely on voluntary cooperation to obtain the information it needs.[13]

To add force to the conduct of an agency's investigations, an agency can be given subpoena power or it can be given *in personam* jurisdiction over domestic or over domestic and foreign persons, or it can be given any combination of these forms of compulsory process. The choice is that of Congress, not the agency or the courts. Each of these powers must be found separately in the legislative grant. An agency can be challenged if it seeks to invoke compulsory process against persons over whom it has been given no such authority, *Serr v. Sullivan*, D.C., 270 F.Supp. 544, aff'd 390 F.2d 619 (CA 3 1968), or if it operates beyond the scope of its subject matter jurisdiction. *Canadian Pacific Ltd. v. United States*, 379 F.Supp. 128 (D.D.C.1974). Each is a separate ground for invalidating agency action. *Leasco Data Processing Equipment Corp. v. Maxwell*, 468 F.2d 1326 (CA 2 1972). Moreover, even where a statute provides for personal jurisdiction, such authority does not extend to persons outside the territorial jurisdiction unless it is written specifically to apply to them, or at least in such broad terms as to warrant interpretation that service abroad was intended to be included.[14]

Judge Friendly, in *Leasco Data Processing Equipment Corp. v. Maxwell*, supra, was faced with challenges against the exercise of authority by the SEC over non-residents. His opinion elucidates on the distinction between "subject matter jurisdiction" and "personal jurisdiction" and is instructive as to the type of examination of a statute which must be made and which was not made below or by the majority.[15]

Had such an examination been made, the only conclusion is that Congress did not give the ITC *in personam* jurisdiction under the subject statute as originally enacted, and no change in this respect was made by the amendments of the Trade Act of 1974.

The compulsory process which has been given to the ITC is broad subpoena power under 19 U.S.C. § 1333. In addition, the ITC has been given authority to investigate on its own in the U. S. or abroad under 19 U.S.C. § 1331(d).

This is the extent of the ITC's authorized powers in conducting a § 1337 investigation, as well as others for which it has responsibility, and its powers have remained unchanged since the creation of its predecessor, the Tariff Commission, in 1916 (39 Stat. 795).

Investigations by the Tariff Commission relating to unfair methods of competition in the importation of articles into the United States were first authorized by the Tariff Act of 1922 (42 Stat. 943). As originally conceived, the Commission made a recommendation to the President, after investigating a complaint and making a determination that there were unfair acts which justified either an exclusion order against importation of certain goods or a punitive duty. The issuance of the order was by the President, but such an order had to be supported by the findings of the Commission. *In re Orion Co.*, 22 CCPA 149, 71 F.2d 458, 21 USPQ 563 (1934).

The purpose of the exclusion remedy was to get away from *in personam* procedures which United States business found unsatisfactory. Being unable in most cases to sue

---

13. *Administrative Law*, Bernard Schwartz, Little, Brown & Co., (1976), p. 104.

14. For example, see 8 U.S.C. § 1451(b); 35 U.S.C. §§ 146, 293; 15 U.S.C. §§ 77v(a), 78aa, 79y; 28 U.S.C. § 1655; 38 U.S.C. § 784(a).

15. The majority refers to "evidence" to support a finding of *"in personam"* jurisdiction, without looking for a statutory base.

a foreign supplier, a U.S. business faced with infringing products from abroad was forced to pursue a multiplicity of individual importers, and if a court enjoined one, another could be found to take his place. Thus the exclusion remedy was conceived.

In 1974 the authority and procedures of the ITC were changed in significant respects. The ITC is now authorized to issue exclusion orders, with the President having in effect a veto over such action. Congress also provided for a broader scope of inquiry by the ITC. For example, previously the ITC did not consider questions of patent validity; now it must include a validity determination. On appeal, this court is no longer bound to accept findings of fact whenever supported by some substantial evidence and will not when clearly contrary to the weight of the evidence. *Solder Removal Co. v. U. S. International Trade Commission*, 65 CCPA 120, 582 F.2d 628, 199 USPQ 129 (1978). Broader protection was given to litigants by clear identification of § 1337 investigations as adjudications to be made on the record after notice and opportunity for hearing and specific incorporation of the Administrative Procedure Act (19 U.S.C. § 1337(c)). Significantly, no change was made in what compulsory process is available to the ITC. *In personam* jurisdiction cannot be found in the statute.[16]

The decision below turned on the finding that the ITC had *in personam* jurisdiction over Unipak. If that basis is not accepted, the order must be vacated and the case remanded. It is for the ITC to judge initially whether its findings are supportable "on the record" if *in personam* jurisdiction is not required to support them. Not even the broadest reading of the *Chenery* case, supra, allows this court to substitute evidentiary findings for the findings below. The *Chenery* case and its long line of progeny clearly prohibits this court from making the first evaluation of the evidence or inferring that such an evaluation was made be-

low from the *pro forma* reference to the record.

Since the majority and I are in basic disagreement as to the holding in *Chenery,* supra, more than passing reference must be given to the case. The issue in *Chenery* was very similar to that of the instant case. Under review was an order by the Securities and Exchange Commission approving a plan of reorganization of a company. Over objections by respondents, certain preferred stock which respondents had acquired, unlike preferred stock of others, could not be converted into stock of the reorganized company. The Commission did not find any fraudulent acts in the acquisition of the stock by the respondents, but relied upon the fact that the respondents were reorganization managers. The Commission, by analogy, applied the legal restrictions imposed on trustees to respondents, relying on broad equitable principles. The Supreme Court stated:

Since the decision of the Commission was explicitly based upon the applicability of principles of equity announced by courts, its validity must likewise be judged on that basis. The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based. [318 U.S. at 87, 63 S.Ct. at 459.]

After remand, the case came before the Supreme Court again in *SEC v. Chenery Corp.,* 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947). In the second case different grounds were advanced and these were upheld. The Court stated:

When the case was first here, we emphasized a simple but fundamental rule of administrative law. That rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such actions solely by the grounds in-

---

16. The majority relies on the authority of the ITC to make reasonable rules of procedure. 19 U.S.C. § 1335. No rule or regulation can expand the basic jurisdiction of the ITC. *Soriano v. United States,* 494 F.2d 681 (CA 9 1974);

*Federal Maritime Comm. v. Anglo-Canadian Shipping Co.,* 335 F.2d 255 (1964). Nor did the ITC follow it rules here, which it was obligated to do, if sanctions for failure to make discovery were to be imposed.

voked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

We also emphasized in our prior decision an important corollary of the foregoing rule. If the administrative action is to be tested by the basis upon which it purports to rest, that basis must be set forth with such clarity as to be understandable. It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive. In other words, "We must know what a decision means before the duty becomes ours to say whether it is right or wrong." [332 U.S. at 196–97, 67 S.Ct. at 1577.] [Citation omitted.]

The quotation in the *Chenery* case noted by the majority that a decision may be affirmed if the result is correct, "although the lower court relied upon a wrong ground or gave a wrong reason," is taken from *Helvering v. Gowran*, 302 U.S. 238, 245, 58 S.Ct. 154, 157, 82 L.Ed. 224 (1937). In *Helvering* the alternative grounds had been argued before the first decision maker, in that case the Commissioner of Internal Revenue, and different grounds had been adopted by the Board of Tax Appeals. The reviewing appellate court adopted the Commissioner's position. The Supreme Court affirmed, but even in *Helvering* the Court *remanded* to give the petitioner an opportunity to put in additional evidence because of the change in the basis for the decision. No support can be found in *Chenery* or *Helvering* for this court to uphold an order by interjecting a new ground, *sua sponte*, which was not advanced by the Government, briefed by the parties, or argued to this court, and which requires an evaluation of evidence. Such an evaluation is specifically proscribed in *Chenery*. The statement quoted by the majority is followed by:

But it is also familiar appellate procedure that where the correctness of the lower court's decision depends upon a determination of fact which only a jury could make but which has not been made, the appellate court cannot take the place of the jury. Like considerations govern review of administrative orders. [318 U.S. at 88, 63 S.Ct. at 459.]

The prohibition against substitution of this court's judgment cannot be escaped by relying on the ITC's conclusory statement that "on the record" the Unipak process has been found to be an infringement. *Chenery* requires not only findings but an explanation.

In *State Corp. Com'n of Kansas v. FPC*, 206 F.2d 690 (CA 8 1953), the court remanded where the Commission order under review stated explicitly that the Commission had examined "all of the available evidence of record."

In *NLRB v. Clement-Blythe Co.*, 415 F.2d 78 (CA 4 1969), an order entered after a summary judgment proceeding before the NLRB was vacated and remanded for the following reasons:

[T]he use of summary judgment in deciding whether an employer has committed an unfair labor practice does not exempt the Board from complying with the Administrative Procedure Act [5 U.S.C. § 557(c)]. . . .

\* \* \* \* \* \*

When the Board rules that an employer has committed an unfair labor practice, the employer is entitled to know, and the Board is charged with the duty of stating, the reasons why the Board concluded the facts showed a violation of the law. [*Id.* at 81.]

\* \* \* \* \* \*

[L]ack of clarity in the administrative process infects review with guesswork. [*Id.* at 82.]

See also *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167–68, 83 S.Ct. 239, 245, 9 L.Ed.2d 207, reaffirming the *SEC v. Chenery Corp.* requirements that

the order be upheld on the basis articulated by the agency itself and that findings below must be specific.

Moreover, the absence of required findings is fatal even though there may be ample evidence to make the finding.[17] As stated in *Anglo-Canadian Shipping Co. v. Federal Maritime Commission*, 310 F.2d 606, 617 (CA 9 1962):

> For the Commission, without any attempt whatever to comply with the requirements of § 8(b) [now 5 USC 557(c)], to issue its conclusory order of January 23, 1962, merely in the language of the statute, was an egregious error.
>
> As noted in [*Saginaw Broadcasting Co. v. FCC* (D.C.Cir.), 96 F.2d 554, 563 (1938)], the absence of required findings is fatal to the validity of an administrative decision regardless of whether there may be in the record evidence to support proper findings. We were not required therefore to inquire as to what evidence there was which might have supported adequate findings . . . .

The requirement for specific, definite, and basic findings, not mere ultimate findings or conclusions, is well settled and without contradiction. See *United States v. Pierce Auto Freight Lines*, 327 U.S. 515, 66 S.Ct. 687, 90 L.Ed. 821 (1946); *Colorado-Wyoming Co. v. Federal Power Commission*, 324 U.S. 626, 65 S.Ct. 850, 89 L.Ed. 1235 (1945); *Morgan v. United States*, 298 U.S. 468, 56 S.Ct. 906, 80 L.Ed. 1288 (1936); *United States v. Chicago, M. St. P. & P. R. Co.*, 294 U.S. 499, 55 S.Ct. 462, 79 L.Ed. 1023 (1935); *Florida v. United States*, 282 U.S. 194, 51 S.Ct. 119, 75 L.Ed. 291 (1931); Davis Administrative Law Treatise, Chapter 16, ¶ 16.01–16.14.

Since there are no findings in the order below other than conclusory findings as to Unipak and Conform and their importers, the order is not in conformity with 5 U.S.C. § 557(d) (APA). The order should be vacated and the case remanded for review by the ITC of the evidence, with consideration being given to requests by all parties to submit additional evidence in view of the numerous procedural errors which resulted in no foundation for its issuance.

*The Scope of the Order*

The majority modifies the effect of the order below by placing Unipak in the same position as every other foreign manufacturer of multicellular plastic film who was not a party to the proceeding. All multicellular plastic film products, except those of Tong Seae, are blocked until a determination is made by the ITC in a subsequent proceeding that they are made by a non-infringing process.

I have previously expressed my views that the ITC may not issue an exclusion order broader than the investigation it noticed and conducted.[18] In this case, it is particularly offensive that the ITC has invoked sanctions against an entire industry throughout the world on the basis of technical "defaults" by two named respondents.

What has occurred here results from broad judicial construction, not congressional action. This court endorsed the concept that patent infringement without other unfair acts, such as false advertising or unfair pricing (both alleged by complainant here but not found below) constitutes an unfair method of competition within the meaning of 19 U.S.C. § 1337. Such "other acts" which originally were considered an inherent requirement in the statute pinpointed who were violators. Assuming that the judicial interpretation which finds patent infringement *per se* enough under § 1337 is correct, it does not follow that orders may issue against an industry. The ITC is engaged in adjudication, not industry-wide rule-making, in the type of proceeding here under review.

**17.** There is no ample evidence here. Mr. Fielding's testimony is contradicted by the testimony of the ITC staff that the extrusion process of Unipak, like that of Tong Seae, was not an infringement.

**18.** *Canadian Tarpoly Co. v. U. S. International Trade Commission*, 640 F.2d 1322, Cust. & Pat. App. Appeal No. 81–5, dissenting opinion of February 5, 1981.