**AEROQUIP CORPORATION, Plaintiff,**

v.

**The UNITED STATES, Defendant,**

**Engineered Air Systems, Inc., Third-party defendant,**

**J.C. Carter Company, Inc., Third-party defendant.**

**No. 95–15C.**

United States Court of Federal Claims.

Jan. 10, 1997.

Mark C. Schaffer, Toledo, Ohio, for plaintiff. Emch, Schaffer, Schaub & Porcello Co., L.P.A., of counsel.

William C. Bergmann, Department of Justice, Washington, D.C., with whom was Assistant Attorney General Frank W. Hunger, for defendant. Vito J. DiPietro, Director; and Thomas J. Byrnes, of counsel.

Linda L. Shapiro, St. Louis, Missouri, for third-party defendant Engineered Air Systems, Inc. Timothy F. Noelker, Frank B. Janoski, and Michael T. Marrah, Thompson Coburn, of counsel.

David S. Foster, Chicago, Illinois, for third-party defendant J.C. Carter Company, Inc. David A. York and David A. Nelson, Latham & Watkins, of counsel.

## OPINION

FUTEY, Judge.

This patent infringement case is before the court on cross-motions for summary judgment. Plaintiff asserts that a fuel coupling used by defendant and manufactured by a third-party defendant literally infringes plaintiff's patent rights. Alternatively, plaintiff argues that the accused coupling infringes under the doctrine of equivalents. The third-party defendant contends that its coupling does not infringe upon plaintiff's patent rights in any way. Plaintiff and the third-party defendant agree that there are no genuine issues of material fact and each claims entitlement to judgment as a matter of law.

### Factual Background

#### A. Background of Patented Invention

As part of a system for refueling military aircraft, defendant, the United States, uses coupling devices for connecting fuel hoses. As late as 1992, plaintiff, Aeroquip Corporation, acted as the sole source of these couplings. A single coupling from plaintiff is formed by a connection of two identical (sexless) units, each attached to the ends of hoses. In the current commercial embodiment, each unit has a pair of metal projections, or lugs, that extend from the unit's body.[1] Each unit also has a circular groove designed to receive the lugs from another unit.[2] The connection of two units is initiated by guiding the lugs of each unit into the corresponding groove of the opposite unit. Each groove includes enlarged access areas

---

1. Figure 3 in Appendix A to the court's opinion contains a cross-sectional side view of a unit found in the commercial embodiment of plaintiff's patented coupling. *See also* J.C. Carter Company (JCC) App. at 17, 18. One lug is shown in this figure and is labelled by numbers 52 and 56.

2. App. A, no. 60.

to receive the other unit's lugs.[3] After this has occurred, the connection is completed by rotating the units against each other, thereby sliding the lugs through the grooves. Eventually, the lugs of one unit contact the lugs of the other unit, preventing further rotation of the units. Once the lugs slide past the enlarged access areas, they cannot be withdrawn from the grooves unless the units are rotated in the opposite direction.

In order to regulate the flow of fluids through the coupling, each unit contains a ball valve.[4] This valve is spherical in shape with a bore running through the diameter. A handle on the outside of the unit is used to rotate the ball valve to the "open" position, where the bore is aligned with the hose. From this position, turning the handle ninety degrees rotates the ball valve ninety degrees and blocks the flow of fluid as a result. Thus, in order for the fluid to flow through a coupling, the valves of both units must be in the open position.

Given the distractions that may occur during the refueling of military aircraft, there is a risk that operators may open the valves before the units are completely connected. Another risk is that the units may be disconnected before the valves are closed. These circumstances would allow fuel to spill and endanger military personnel. To prevent such occurrences, plaintiff developed a safety mechanism built into the coupling. Plaintiff's commercial embodiment of this safety mechanism is comprised of a detent pin and recess housed in each unit.[5] While a unit's valve is closed, the detent pin remains within the body of the unit. The movement of the valve and the detent pin are connected through the use of a cam so that opening the valve causes the detent pin to extend forward from the unit.[6] Thus, assuming two units are completely coupled, each unit's detent pin will be aligned with the opposite unit's recess and, as the valve is opened, the detent pins extend into the recesses. If, however, the units are

only partially coupled, the pins and recesses will be out of alignment and extension of each pin will be blocked by the body of the opposite unit. Because movement of the valve is dependent upon movement of the pin, blocking the extension of the pin necessarily blocks the opening of the valve. Under this design, the valves cannot open until the units have been fully connected.

Once the units are fully connected and the valves are open, the detent pins extend into the opposing units' recesses and prevent the two units from rotating against each other and disconnecting. Closing the valves, however, retracts the pins. Only then can the units be disconnected. Thus, as a further feature of this detent/recess design, the units cannot be disconnected until both valves are closed. This embodiment is described in United States Patent No. 4,483,779 ('779 patent), issued on March 27, 1984. The inventor, Alan R. Allread, is an employee of plaintiff.

As early as 1988, defendant sought alternate sources for couplings that were compatible with plaintiff's product. On at least one occasion, plaintiff informed a potential supplier that such couplings would be covered by plaintiff's patent rights.[7] Ultimately, however, defendant obtained couplings from two other companies—Engineered Air Systems, Inc. (EASI) and Lear Astronics Corp. (Lear). These two companies obtained their couplings from the J.C. Carter Company (JCC).

### B. Background of Accused Device

In 1992, JCC began attempts to develop a sexless ball valve coupling that would be compatible with plaintiff's couplings yet would not infringe plaintiff's '779 patent. Like plaintiff's coupling, JCC's coupling is comprised of two identical units connected by inserting each unit's lugs into the opposite unit's groove and rotating the two units against each other.[8] Furthermore, each JCC

---

3. The enlarged access areas are labelled by number 64 in figure 2 of Appendix A. Figure 2 represents a frontal view of a unit.

4. App. A, no. 22.

5. Id., no. 68 (detent pin), no. 75 (recess).

6. Id., no. 42.

7. JCC App. at Ex. D (Fed.Cl. May 10, 1988).

8. Figure 1 in Appendix B to the court's opinion illustrates JCC's coupling, comprised of two identical units. The lugs are labelled as no. 50, the grooves are labelled as no. 52.

unit also uses a ball valve, which has an attached stem pin.[9] The safety mechanisms that prevent fuel from spilling, however, are different from those found in plaintiff's commercial embodiment. Each JCC unit contains a spring-loaded "lock-out key."[10] Rather than extending the key out from the unit, the spring only partially extends the key into the unit's own groove.[11] During the initial connection process, the key is pushed inward by one of the opposing unit's lugs.[12] In this position, the key blocks the stem pin from rotating, which, in turn, prevents the ball valve from rotating. As the connection is completed by rotating the units against each other, the lug slides through the groove, past the key.[13] Once the lug no longer depresses the key, the spring once again pushes the key partially into the groove. With the key in this extended position, the stem pin is no longer blocked and the valve may be opened. The interaction of the lug, key, and stem pin therefore prevent opening the valve until the units are connected.

Conversely, once the valve is rotated to the open position, the stem pin rotates so as to block the key from retracting.[14] If disconnection is attempted, the lugs' pathway through the recess is eventually blocked by the key. Rotating the valve closed, however, also rotates the stem pin to a position that allows the key to retract upon contact with the opposing lug.[15] Thus, the units cannot be disconnected until both valves are closed.[16]

This ball valve coupling is also the subject of a patent—no. 5,332,001—of which JCC is the assignee of patent rights. In the patent application, JCC cited plaintiff's '779 patent. During prosecution, the primary examiner, who also had examined the '779 patent twelve years earlier, initially rejected eight of JCC's sixteen claims based on that patent.[17] JCC responded by detailing the differences between its mechanism and what was disclosed in the '779 patent. For example, JCC pointed out that the '779 patent discloses a locking mechanism that moves in response to rotation of the ball valve, whereas the movement of JCC's lock-out key is not dependent upon rotation of the ball valve.[18] As a result, the examiner allowed all of JCC's claims. JCC's patent issued on July 26, 1994.

## C. The Parties

Plaintiff filed suit in this court on January 6, 1995, claiming that defendant's use of JCC's couplings infringed plaintiff's patent rights granted in the '779 patent. Defendant, in turn, filed a motion to issue notice to third parties in the case. Specifically, defendant asked that the court notify EASI and Lear, who provided the competing couplings, as well as JCC, who manufactured the couplings and supplied them to EASI and Lear. Defendant indicated that these three companies may be obligated to indemnify defendant for patent infringement, based upon either an express indemnity agreement or an implied warranty of noninfringement under U.C.C. § 2–312(3). The court granted defendant's motion and issued notice to EASI, Lear, and JCC on May 24, 1995. On July, 13, 1995, EASI and JCC formally joined the lawsuit as third-party defendants by filing their answers to plaintiff's complaint. A status conference held on May 9, 1996, revealed that Lear was not joining in the suit. Rather, Lear was satisfied with JCC defending Lear's interests.

---

9. *Id.*, no. 20 (ball valve), no. 72 (stem pin).

10. *Id.*, fig. 3.

11. *Id.*, figs. 5, 6.

12. *Id.*, fig. 4.

13. *Id.*, fig. 5.

14. *Id.*, fig. 6.

15. *Id.*, fig. 7.

16. JCC's unit is also equipped with a recess capable of receiving the detent pin found in plaintiff's unit, thereby allowing JCC's units to be compatible with plaintiff's units. The recess in JCC's unit, however, serves no function when two of JCC's units are connected. Moreover, even when the coupling involves connecting a JCC unit with plaintiff's unit, the recess plays no part with the lug/lock-out key/cam mechanism that provides JCC's safety features.

17. JCC App. at 187.

18. *Id.* at 192–93.

On May 10, 1996, JCC moved for summary judgment, claiming that its coupling does not infringe upon plaintiff's patent rights either directly or under the doctrine of equivalents. Defendant and EASI support JCC's position. On July 12, 1996, plaintiff cross-moved for summary judgment. The court heard oral argument on the motions on December 11, 1996.

## Discussion

### I. Summary Judgment

Summary judgment is appropriate when the pleadings raise no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. RCFC 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). The moving party bears the burden of establishing an absence of evidence to support the non-movant's case. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The party opposing summary judgment has the burden of showing sufficient evidence, not necessarily admissible, of a genuine issue of material fact in dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir.1985), to whom the benefit of all presumptions and inferences runs. *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

In the present case, the parties do not dispute the material facts. Thus, infringement will be determined based on the interpretation of the claims in plaintiff's '779 patent, which is a matter of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed.Cir.1995), *aff'd*, —— U.S. ——, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). Accordingly, summary judgment is proper.

### II. Infringement

Determining infringement is a two-step process. The first step is to determine the meaning and scope of the patent claim asserted to be infringed. *Id.* The second step is to compare the allegedly infringing device to the properly construed claim. *Id.* A finding of infringement requires that every limitation of a claim be met in the accused device either exactly or by an equivalent. *Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931, 935 (Fed.Cir.1987) (en banc), *cert. denied*, 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426 (1988). To demonstrate infringement, plaintiff therefore must show that every limitation in at least one of its independent claims is present in the accused device. *Dolly, Inc. v. Spalding & Evenflo Cos.*, 16 F.3d 394, 397 (Fed.Cir.1994); *Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573, 1576 (Fed.Cir.1993); *Davies v. United States*, 31 Fed.Cl. 769, 773 (1994). JCC, on the other hand, need only show that one of the limitations is not present in the accused device in order to prevail on its summary judgment motion for non-infringement. *Davies*, 31 Fed.Cl. at 773. In cases where literal infringement is not established, infringement may be proved under the doctrine of equivalents. *See Hilton Davis Chem. Co. v. Warner–Jenkinson Co.*, 62 F.3d 1512 (Fed.Cir.1995) (en banc), *cert. granted*, —— U.S. ——, 116 S.Ct. 1014, 134 L.Ed.2d 95 (1996).

### A. Claim Construction

The pertinent language appears in claim 1 of plaintiff's '779 patent, which claims the following:

> A coupling comprising ... a ball valve, ... a valve actuator attached to said ball valve, ... [a] first locking means defined upon said first body operatively connected to said valve actuator for selective movement between first and second positions upon rotation of said ball valve between said open and closed positions, respectively, and second locking means defined on said second body alignable with and receiving said first locking means upon said first and second coupling attachment means being in the fully coupled condition permitting said first locking means to be shifted from said second position to said first position to permit said ball valve to be rotated only

upon said first and second bodies being fully coupled. . . .

This language is also found in independent claims 2 and 4 of the '779 patent, as well as dependent claims 3 and 5 by reference.[19] The relevant limitation in this case concerns the first locking means being "operatively connected" to the valve actuator, which, in turn, is connected to the ball valve. The claim proceeds to define this limitation by indicating that the first locking means changes position "upon rotation of said ball valve." The claim further reveals that the first locking means "permit[s]" the ball valve to rotate into the open position only when the first and second locking means are in alignment. Based on these statements, the court interprets plaintiff's claims to cover a first locking means that functions by: (1) changing positions, where (2) such movement is dependent upon movement of the ball valve.[20] Conversely, movement of the ball valve is dependent upon movement of the locking means. Given this interpretation, the court must now compare the claims in the '779 patent to the accused device in order to determine whether JCC's coupling infringes upon plaintiff's patent rights. *Markman*, 52 F.3d at 976.

### B. *Literal Infringement*

■ Literal infringement of a claim exists when every limitation recited in the claim is found in, or "reads on," the accused device. *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1580 (Fed.Cir.1989). For a means-plus-function limitation to read on an accused device, the accused device must, *inter alia*, perform the identical function required by the limitation. *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1388–89 (Fed.Cir.1992). Based on the court's interpretation of plaintiff's '779 patent, plaintiff's claims contain a first locking means limitation that functions by changing positions when the ball valve changes positions. JCC contends that this first locking means corresponds to the JCC device's lock-out key, which does not function by mov-

ing with the ball valve. Plaintiff, on the other hand, asserts that its first locking means corresponds to the combination of the stem pin, spring, *and* the lock-out key of JCC's device. Plaintiff acknowledges, however, that only the stem pin moves with the ball valve. Even under plaintiff's interpretation, and as demonstrated in the court's discussion of JCC's device, the spring and the lock-out key do. not move with the ball valve. Thus, there is no element or collection of elements in JCC's device that functions as a first locking means by changing position upon rotation of the ball valve. Because this limitation is absent in JCC's device, there can be no literal infringement. *See Johnston*, 885 F.2d at 1580.

### C. *Infringement Under the Doctrine of Equivalents*

■ Even though one or more elements of a claim are literally absent, a patentee may establish infringement under the doctrine of equivalents when the accused device and the patented device have only insubstantial differences. *Hilton Davis*, 62 F.3d at 1517. In determining these differences, courts examine whether the devices perform substantially the same function in substantially the same way to achieve the same result. *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950); *Alpex Computer Corp. v. Nintendo Co.*, 102 F.3d 1214, 1222–23 (Fed.Cir. 1996). The range of equivalents covered by an invention depends on the advancement over the prior art represented by the invention. A pioneer invention, for instance, is entitled to a broad range of equivalents under the doctrine. *Sealed Air Corp. v. United States Int'l Trade Comm'n*, 645 F.2d 976, 984–85 (C.C.P.A.1981). An invention representing only a modest advancement over the prior art is given a more restricted application. *Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 1362 (Fed.Cir.1983). Further, the tripartite function-way-result test may not end the inquiry. Other evidence may also indicate the substantiality of differences,

---

**19.** '779 patent, cols. 5–8; JCC App. at 22–23.

**20.** The court notes that its interpretation of "first locking means," as broadly set out in several of

plaintiff's claims, does not rely upon any additional limitations contained in claim 2.

such as the grant of a separate patent on the accused device. *Zygo Corp. v. Wyko Corp.*, 79 F.3d 1563, 1570 (Fed.Cir.1996). When a party presents such additional evidence, the court must consider it. *Hilton Davis*, 62 F.3d at 1518.

JCC emphasizes that the way its coupling functions is different from the way described in plaintiff's claims. In addition, JCC argues that its ability to obtain a patent for its own coupling demonstrates the substantial differences between its patent and plaintiff's patent. Plaintiff, however, asserts that JCC's coupling is equivalent to the coupling claimed in the '779 patent under the function-way-result test. Moreover, plaintiff contends that JCC's patent does not serve as further evidence of the differences between the couplings because a later-issued patent may still infringe upon a prior patent.

### 1. *Function–Way–Result Test*

Concerning the range of equivalents covered by plaintiff's invention, plaintiff claims that it is entitled to a broad range of equivalents. Plaintiff emphasizes the pioneer nature of its invention by pointing out that, during approximately eight years of supplying couplings to defendant, no other competitor stepped forward to offer alternate couplings. Plaintiff's status as the sole source of couplings, however, may have more to do with the fact that plaintiff warned competitors about infringement than with the pioneer nature of the coupling.[21] The court is, therefore, more influenced by a series of patents, addressed by plaintiff and JCC, that disclose the basic operational concept of plaintiff's invention: a coupling unit's valve cannot be opened until it is completely connected. For example, the Cerbin patent no. 3,382,892, issued May 14, 1968, discloses sexless ball valve couplings, where each unit has a "lock ring" that interlocks with the opposite unit's lock ring, thereby completely encircling the connection point.[22] The ball valves

open only after the lock rings connect the coupling units.[23] Hence, plaintiff's invention is not entitled to pioneer status. That does not mean, however, that plaintiff is entitled to no equivalents. Nor does it mean that plaintiff's invention is limited to the very narrow range of equivalents applicable to mere improvement patents in a crowded art. It is undisputed that plaintiff's invention is patentably distinct from prior references.

Moreover, plaintiff's claims contain specific words of limitation. Based on the court's interpretation of these claims, the court determines that the claimed coupling functions by blocking the movement of the first locking means which, in turn, blocks the movement of the ball valve. Plaintiff's coupling functions by the placement of the first locking means of one unit relative to the second locking means of the opposite unit so that the two means are not aligned until the units are fully coupled. The result, as delineated in the '779 patent, is that the ball valves in plaintiff's couplings cannot be opened until the units are fully connected.[24]

JCC's coupling achieves the same result. Nevertheless, the operation, as described by the parties and illustrated by the exhibits, demonstrates differences in the function performed by JCC's coupling, as well as in the way the function is carried out. Specifically, JCC's device functions through movement of the lock-out key during connection, which blocks the movement of the valve. Thus, where plaintiff's coupling functions by *preventing* movement within the locking mechanism, JCC's coupling functions in a diametrically opposed manner by *requiring* movement of part of the locking mechanism. The way JCC's device accomplishes this function is by the placement of the lock-out key of one unit relative to a lug of the opposing unit so that the key and lug are aligned at the beginning of the connection process. Once again, this is fundamentally

---

**21.** *See, e.g.,* JCC App. at Ex. D (informing a potential competitor that plaintiff had patent rights to subject matter of defendant's solicitation).

**22.** *Id.* at Ex. N.

**23.** Cerbin '892, col. 2, lns. 44–48 (JCC App. at Ex. N); *see also* Gill patent no. 2,948,553, col. 1, lns. 41–48 (JCC App. at Ex. K); Courtot patent no. 3,159,180, col. 1, lns. 40–45 (JCC App. at Ex. L); De Graaf patent no. 3,479,005, col. 2, lns. 32–39 (JCC App. at Ex. M).

**24.** '779 patent, col. 6, lns. 19–22.

different from the way found in plaintiff's coupling, where the locking components do not interact until the end of the connection process. Although the two devices achieve the same result, they do not perform substantially the same function, nor do they function in substantially the same way. Because JCC's coupling has no element equivalent to plaintiff's first locking means, JCC's device does not infringe plaintiff's patent claims under the doctrine of equivalents.

The court notes that the parties address a second result mentioned in plaintiff's patent specification, which states that the units cannot be disconnected until the valves are closed.[25] The specification goes on to indicate that plaintiff's coupling functions during attempts at disconnection by preventing relative motion between the coupling units.[26] The way plaintiff's coupling carries out this function is through the resistance resulting from the interaction between the first locking means of one unit and the second locking means of the opposite unit.[27] Again, the result achieved in JCC's coupling is the same. Moreover, the way JCC's coupling operates is substantially the same in that disconnection is prevented through resistance between the lock-out key of one unit and a lug of the opposite unit. The function of JCC's coupling, however, is contrary to the function of the couplings in plaintiff's claims. Whereas the functioning of plaintiff's coupling *prevents* relative motion of the units, JCC's coupling *allows* the units to move relative to one another. JCC's coupling functions only to prevent the final stage of disconnection—where the lugs rotate back to the enlarged access areas and can be removed from the opposite unit. Thus, although infringement under the doctrine of equivalents focuses on the limitations in the patent claims,[28] the additional result addressed in the specification further supports the court's finding of no infringement.

### 2. Other Evidence of Substantial Differences

The grant of a patent on an accused device does not conclusively avoid infringement. *National Presto Indus., Inc. v. West Bend Co.*, 76 F.3d 1185, 1191 (Fed.Cir.1996). Improvements or modifications may indeed be separately patentable if the requirements of patentability are met, yet the device may still infringe a prior patent. *Id.* at 1191–92. The fact, however, that the accused infringer's patent overcame a prior art reference to plaintiff's patent is a factor indicating that plaintiff's device is substantially different. *Id.* at 1192; *Zygo*, 79 F.3d at 1570.

In *Zygo*, the Federal Circuit noted that the accused infringer cited the accuser's patent while the accused was seeking to patent its own interferometer. The court found that granting a patent to the accused after citation to and consideration of the accuser's patent was relevant to the issue of whether the accused's invention was substantially similar. *Id.* Likewise, in the present case, JCC applied for a patent for its coupling, citing plaintiff's '779 patent as a reference considered in the course of preparing the application.[29] The primary examiner, who also served as examiner for the '779 patent, rejected eight of JCC's claims as being anticipated by the '779 patent or an obvious modification thereof.[30] Significantly, the examiner allowed eight more of plaintiff's claims without objection.[31] As for the rejected claims, JCC sought to distinguish its coupling from the coupling in the '779 patent and requested reconsideration without modifying the claims.[32] In response, the examiner allowed all of JCC's claims,[33] and the United States granted JCC a patent for the coupling.[34] Thus, in accordance with *Zygo*, the circumstances before the court further

---

25. *Id.*, col. 1, lns. 51–56.

26. *Id.*, col. 5, ln. 17.

27. *Id.*, lns. 15–16.

28. *Roton Barrier, Inc. v. Stanley Works*, 79 F.3d 1112, 1126 (Fed.Cir.1996).

29. JCC App. at 184–85.

30. *Id.* at 186–88.

31. *Id.* at 186.

32. *Id.* at 189–94.

33. *Id.* at 195.

34. *Id.* at 138–39.

demonstrate the substantial differences between JCC's coupling and plaintiff's coupling.

### Conclusion

For the reasons discussed above, the court finds that JCC's coupling does not infringe plaintiff's patent either literally or under the doctrine of equivalents. Accordingly, JCC's motion for summary judgment is granted and plaintiff's cross-motion for summary judgment is denied. The Clerk is directed to dismiss plaintiff's complaint. No costs.

APPENDIX

Counties of Southeast Texas

LEGEND:

= Borders of Original Claim Area

= Portions of Original Claim Area Excised To Form the Modified Claim Area (MCA).