**CLOSE AND STEWART, Plaintiff,**

v.

**UNITED STATES, Defendant.**

C.D. 2985; Protest Nos. 63/4471–23854
and 63/7256–23757.

United States Customs Court,
Second Division.
April 27, 1967.

Glad & Tuttle, San Francisco, Cal. (George R. Tuttle, Jr., San Francisco, Cal., of counsel) for plaintiff.

Barefoot Sanders, Asst. Atty. Gen. (Bernard J. Babb, New York City, trial attorney), for defendant.

Before RAO and FORD, Judges, and DONLON, Senior Judge.

RAO, Chief Judge:

These consolidated protests concern the proper classification of small, bar shaped pieces of indium antimonide, imported from Canada. On the invoices covered by the protests, the importations are listed as "1 piece Grade 35S indium

antimonide," "1 piece doped N, SXL indium antimonide," "1 piece doped P, SXL indium antimonide," "1 piece Grade 24 indium antimonide." The collector classified the merchandise as articles, not specially provided for, composed wholly or in chief value of other metal under paragraph 397 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, 82 Treas.Dec. 305, T.D. 51802, and, accordingly, assessed duty thereon at the rate of 22½ per centum ad valorem.

Plaintiff claims that these bars are classifiable under paragraph 353 of the Tariff Act of 1930, as modified by said general agreement, as either articles, finished or unfinished, suitable for producing, rectifying, modifying, controlling, or distributing electrical energy, or as finished or unfinished parts of such articles and, hence, dutiable at the rate of 15 per centum ad valorem.

The relevant statutory provisions read as follows:

Paragraph 397, as modified, supra:

Articles or wares not specially provided for, whether partly or wholly manufactured:

Composed wholly or in chief value of iron, steel, lead, copper, brass, nickel, pewter, zinc, aluminum, or other metal (not including platinum, gold, or silver), but not plated with platinum, gold, or silver, or colored with gold lacquer:

\* \* \* \* \* \* \* \* \*

Other \* \* \* ....................... 22½% ad val.

Paragraph 353, as modified, supra:

Articles suitable for producing, rectifying, modifying, controlling, or distributing electrical energy, \* \* \* finished or unfinished, wholly or in chief value of metal, and not specially provided for:

\* \* \* \* \* \* \* \* \*

Other articles \* \* \* ................ 15% ad val.

Parts, finished or unfinished, wholly or in chief value of metal, not specially provided for, of articles provided for in any item 353 of this Part .... The same rate of duty as the articles of which they are parts.

———◆———

At the trial of this case, one witness testified on behalf of the plaintiff. He was Mr. R. I. Blake, superintendent of the electronic materials plants of Consolidated Mining and Smelting Co. (Cominco) located at Trail, British Columbia, Canada. Mr. Blake holds a B.S. in Chemical Engineering from the University of Saskatchewan. He has worked for Cominco for 12 years, is in charge of the development, production, and shipping of indium antimonide and

was familiar with the merchandise at bar.

According to Mr. Blake, indium antimonide is formed by the synthesis of indium and antimony in a molten state and then purified to enhance certain electrical characteristics. A sample bar was introduced in evidence as plaintiff's illustrative exhibit 1. The different grades of indium antimonide are ranked by their so-called "electronic mobility"

at a specified point on the Kelvin temperature scale and are sold by the gram or length. Their rating is a function of the size of the piece of indium antimonide, its resistance to electrical current and various computations based thereon and indicates the suitability of the piece for certain electronic applications. A more elaborate treatment of this aspect of the testimony is precluded by the fact that much of the witness' statements were not clarified sufficiently for evaluation by non-scientific arbiters. A price-list adhering to the above-mentioned method of grading was introduced in evidence as plaintiff's exhibit 2.

Mr. Blake indicated that the desirability of indium antimonide lies in its ability to modify and generate electrical energy. It, therefore, finds application in so-called Hall-effect devices in which the indium antimonide, in the presence of a magnetic field, generates a voltage at right angles to the flow of current through it. In addition, the indium antimonide in question if "doped" or if "grown" with a "p" type of indium antimonide (a combination not here at issue) will generate a current when subjected to infrared light. This accounts for the use of indium antimonide in infrared "windows" and infrared detectors. In their condition as imported, however, none of the bars will generate electricity.

The witness could not tell from the grade or weight ordered by a customer what would be the end use of a given shipment of indium antimonide bars; he did not know whether the instant bars were ordered for a specific device but did suggest that all applications would be in the electronics field. Even this, however, is not certain since it appears that in the statement upon which such a conclusion is based the witness was discussing only the infrared detection application of indium antimonide, as per the following colloquy:

JUDGE WILSON: Can you say this: Its application is exclusively in some phases of the electronics field?

THE WITNESS: Exclusively in the electronics field on the infrared detectors.

Normally, the user of the indium antimonide bar at issue will cut or shape the bar with a saw and in some cases polish or etch it to adapt it to his particular needs. Cominco also sells wafer slices of indium antimonide (not here at issue) which, in their imported state, are usually dedicated to use in a particular device although the purchaser may reduce the size of the wafer by etching or chemical action.

It is the contention of the plaintiff that the evidence in this case establishes that the subject indium antimonide falls within the purview of paragraph 353 as an article suitable for the electrical functions detailed herein. This position is grounded upon an interpretation of the word "article" in this provision as including intermetallic compounds and upon an elaboration of the electrical properties attributed to indium antimonide.

Although the parties have joined issue upon the first of the foregoing premises and have expounded at length upon the contemplated scope of the word "article," we are inclined to the view that their emphasis in this connection is misplaced. The issue herein is not whether the indium antimonide at bar rises to a specified level of dignity or achieves a certain degree of artifice at which point the substance becomes what the legislators have chosen to describe as an article. For the word "article" is itself a nebulous concept seemingly employed in the tariff act for the very reason that it possesses an indefinite and neutral meaning. Its vagueness is best exemplied in Webster's New International Dictionary (2d edition, 1951) wherein the word is defined as:

6. A thing of a particular class or kind, as distinct from a thing of another class or kind; * * *.

Consequently, it serves no valid purpose to speculate upon the proposition of whether, in employing the term "article" in a given provision, Congress in-

tended a broad rather than a narrow interpretation of the term. Its frequent use in tariff statutes suggests instead an intention that it assume the meaning and coloration appropriate to its specific context and best suited to effectuate the Congressional plan. This is the clear import of the numerous cases called to our attention by counsel for plaintiff, as for example, United States (American Sponge & Chamois Co., Inc., Party in Interest) v. Nylonge Corporation, 48 CCPA 55, C.A.D. 764, wherein sponge loaves, destined to be sliced into normal sponge size, were held to be partially finished articles of cellulose, to wit, sponges, as opposed to unfinished blocks of cellulose; D. N. & E. Walter & Co., et al. v. United States, 44 CCPA 144, C.A.D. 652, in which 100-foot lengths of cordwoven matchstick-size bamboo strips destined for use, like cloth, in making draperies, window shades, etc., were held to be articles of bamboo wholly or partly manufactured; United States v. Eimer & Amend, 28 CCPA 10, C.A.D. 117, which held bales of glass wool, used, as needed, for filtering purposes in the laboratory to be chemical or scientific articles, not manufactures of glass; or Lussky, White & Coolidge, Inc. v. United States, 21 CCPA 201, T.D. 46727, and Joshua Hoyle & Sons, Ltd., et al. v. United States, 22 CCPA 265, T.D. 47326, where upholstery cloth "in the piece" and cotton goods used for making typewriter ribbons, respectively, were held to be subject to the additional duty prescribed for all "articles" enumerated in schedule 9.

A study of these and other cases treating this matter reveals that nowhere is an unvarying definition of the word "article" promulgated, nor are these cases, in essence, concerned as much with defining this vague term, as they are with ascertaining the intent of Congress regarding specific importations. Consequently, the first issue in this case is best expressed, not in conflicting explanations of the meaning *per se* of the word "article" but rather in contrasting approaches to interpretation of the legislative intent with respect to the nature, composition, and state of advancement of importations falling within paragraph 353.

Paragraph 353 made its first appearance in the Tariff Act of 1930, and its potential effect on existing provisions of the act was the subject of considerable Congressional attention and clarification beforehand. Of particular importance to the legislators was the effect of the new paragraph 353 on paragraph 399 of the Tariff Act of 1922, the forerunner of paragraph 397 of the Tariff Act of 1930. According to the Summary of Tariff Information of 1929, paragraph 399 of the Tariff Act of 1922 embraced four categories of merchandise, two of which, discussed on page 908, are relevant here:

## MANUFACTURERS OF METAL, N. S. P. F.

Description and uses—Paragraph 399 embraces all finished and partly finished articles manufactured wholly or in chief value of metal and not specially provided for in other paragraphs of schedule 3. The various commodities within the scope of this paragraph may be segregated into four main groups as follows:

\* \* \* \* \* \*

(2) Base metal wares—These include manufactures of ferrous and nonferrous metals which are neither plated with precious metals nor colored with gold lacquer. Wire, n. s. p. f., axes, mechanics' tools, twist drills, reamers, cutters, taps, dies and metal-cutting tools, hinges and hinge blanks, and builders' hardware and other iron and steel manufactures n. s. p. f. are some of the items. Others are products made from the various non-ferrous metals and alloys, such as aluminum, copper, brass, bronze, lead, nickel, zinc, pewter, tin, and other metals, compositions, and manufactures not elsewhere provided for. Upholsterers' nails of chief value of non-ferrous metal, and non-ferrous wire, n. s. p. f. are also included.

(3) Electrical machinery and apparatus—Certain types of electrical machinery and apparatus, such as transformers, switches, circuit breakers, fuse choke coils, reactors, sockets, cutouts, adjustment plugs, industrial electric furnaces and ovens, therapeutic apparatus, X-ray machines, telephone apparatus, spark plugs, and other electrical apparatus and parts n. s. p. f. are included under this group.

The reports of the House Ways and Means Committee and the Senate Committee on Finance, on the subject of the Tariff Act of 1930 in its proposed form (H.R. 2667) suggest that paragraph 353 was to provide for the classification of electrical machinery and apparatus and leave unimpaired the classification of "other metals, compositions, and manufactures not elsewhere provided for * * *" in paragraph 399.

The House Committee stated in House Report No. 7, 71st Congress, 1st session, page 43:

## ELECTRICAL MACHINERY AND APPARATUS

The products of this important group of industries are now dutiable under two paragraphs. Transformers, wiring devices, control apparatus, etc., are assessed at 40 per cent as manufactures of metal, n. s. p. f. under paragraph 399, whereas generators and motors,. which are more expensive and difficult to manufacture and more susceptible to competition, are assessed at only 30 per cent as machines, n. s. p. f. under paragraph 372. Furthermore, litigation over the meaning of the term "machine," as applied to electrical equipment, has resulted in transferring some products to the machinery paragraph and leaving similar products classified under paragraph 399. The industry is of such importance that separate classification of its products are warranted, which is done by this bill.

The Senate Committee on Finance discussed the introduction of paragraph 353 in the following terms in Senate Report No. 37, 71st Congress, 1st session, page 14:

Electrical machinery and apparatus is now dutiable chiefly under several paragraphs as follows: Paragraph 372 as machinery, paragraph 399 as miscellaneous manufactures of metal, paragraph 368 as meters, and paragraph 339 as household utensils. Litigation over the meaning of the term "machine" as applied to electrical equipment has resulted in transferring some products to the machinery paragraph and leaving similar products classified under paragraph 399. In many cases the more highly manufactured articles have thus been subjected to the lower rates, and in other cases products of similar character have been declared dutiable at different rates. All these products, with the exception of such as are household utensils, lighting fixtures, or laboratory instruments, are now grouped together at a single rate.

■ The emphasis in both reports seems to have been on the inclusion in paragraph 353 of electrical articles and devices of a nature advanced in the process of manufacture and possessing aspects of complexity which are the result of artifice rather than natural electrical properties. The reports suggest that paragraph 353 was intended to cover those electrical articles which are electrical machinery, instruments, devices, and apparatus, such as those to which specific reference was made in the third group of articles mentioned in the Summary of Tariff Information, supra. Those articles of this group which were suitable for producing, rectifying, modifying, controlling, or distributing electrical energy were to be classified thereunder.

■ When the instant merchandise is examined in the light of the foregoing, the conclusion is virtually unavoidable that it is not of the type which Congress intended to include in paragraph 353 as

finished or unfinished articles suitable for the electrical uses mentioned above. The instant importation is an intermetallic compound made by joining indium and antimony in a molten state and then purifying it to a point where it possesses certain electrical characteristics. The testimony of plaintiff's witness is replete with elaborations on this basic fact, namely, that the indium antimonide is refined into different grades and that these grades possess electrical characteristics such as electron mobility. None of these elaborations, however, can disguise the fact that we are discussing a material, albeit one capable of sophisticated applications, lending itself to description in complicated and, at times, confusing terminology. Ascribing to indium antimonide a number of advanced applications and describing it in involved scientific terminology does not divert us from concluding that it remains a material, not in the nature of those objects which Congress intended to include in paragraph 353.

Moreover, it appears that plaintiff has not adequately established that the bars of indium antimonide, in their imported form, perform any of the electrical functions detailed in paragraph 353. It is only when a selected piece of indium antimonide is installed in some of the devices mentioned by plaintiff's witness that it purportedly begins to produce, modify, or rectify electrical energy. Accordingly, we are of opinion that the subject merchandise is not encompassed by that portion of paragraph 353, as modified, supra, which provides for articles suitable for distributing, rectifying, or producing electrical energy.

Neither do we consider it to be parts, finished or unfinished, of any of the foregoing articles. In order to establish that an importation is a part, it must be shown that, in its imported condition, it is dedicated for use exclusively with the article of which it is claimed to be a part, and that it serves a necessary or important, or useful purpose in the functioning of that article. Gallagher & Ascher Company v. United States, 52 CCPA 11, C.A.D. 849; United States v. Ford Motor Company, 51 CCPA 22, C.A.D. 831.

The evidence which tends to show that indium antimonide is used in such applications as Hall-effect devices, infrared windows, and infrared detectors, does not satisfy these criteria, in the absence of proof that the instant importation is dedicated to use with any one or more of these devices. Indeed, plaintiff's witness admitted that he could not tell what would be the actual ultimate use of these bars. All he was able to do with respect to potential dedication for ultimate use was to make the general statement that this merchandise was adapted for use in the electronics field. Not only does this fail to support the inference that such use is in devices which perform those electrical functions enumerated in paragraph 353, but it does not show dedication to any specific instrument or device. In the absence of dedication to a prescribed use, in a specific category of articles, it is immaterial whether the bars of indium antimonide in issue are claimed to be parts finished or parts unfinished. The statute provides for both, but lack of dedication is fatal to classification as either.

By reason of the foregoing considerations, we find the contentions of plaintiff to be without merit. All claims in the instant consolidated protests are, therefore, overruled.

Judgment will be entered accordingly.

FORD, J., concurs.

DONLON, Judge (dissenting).

With great respect for my learned colleagues, I do not concur in their opinion that the proofs here of record establish that the merchandise at bar is a mere material and not an article. Whatever subtleties there may be in the tariff term

"article," I find that the described intricate scientific elaboration of metals to produce these bars, so that they acquired specially designed intricate and delicate arrangements of crystals to meet exacting specifications for new and highly sophisticated particular uses in the important technology of electronics, removes these bars, thus processed, from accepted tariff concepts of what remains a mere material, not having been advanced to the status of an article.

That laymen find it difficult to understand the complex semantics of electronics, and indeed it is difficult, does not permit judges to disregard uncontradicted evidence adduced by a witness qualified as an expert in that field. Here the expert witness is the very person who developed the process and supervised the fabrication of these bars to meet customs specifications.

Nor does the fact that, in some instances, trimming the bars for precise fit in the instruments for which they were designed, stand in the way of their being articles, for tariff purposes, and not mere materials.

I find, also, that there is uncontradicted testimony of record that the merchandise at bar performs one, at least, of the electrical functions that is enumerated in paragraph 353, namely, the function of modifying electrical energy. That suffices.

In my opinion the bars, in litigation are shown to be articles, composed in chief value of metal, suitable for modifying electrical energy. That they are also conductors of electrical energy is irrelevant to the issue before us, for the claimed enumeration does not embrace articles, or their parts, suitable for conduction.

I would enter judgment for plaintiff on the protest claim as to the invoice items described as Grade 24, Grade 35S, Doped N SXL and Doped P SXL indium antimonide.