# United States Court of Appeals for the Federal Circuit

---

**CLEARCORRECT OPERATING, LLC, CLEARCORRECT PAKISTAN (PRIVATE), LTD.,**
*Appellants*

**v.**

**INTERNATIONAL TRADE COMMISSION,**
*Appellee*

**ALIGN TECHNOLOGY, INC.,**
*Intervenor*

---

2014-1527

---

Appeal from the United States International Trade Commission in Investigation No. 337-TA-833.

---

## ON PETITIONS FOR REHEARING EN BANC

---

MICHAEL D. MYERS, McClanahan Myers Espey, LLP, Houston, TX, for appellants. Also represented by ROBERT HENRY ESPEY II; GARY HNATH, PAUL WHITFIELD HUGHES, Mayer Brown LLP, Washington, DC.

SIDNEY A. ROSENZWEIG, Office of the General Counsel, United States International Trade Commission, Washington, DC, for appellee. Also represented by WAYNE W. HERRINGTON, DOMINIC L. BIANCHI.

STEPHEN BLAKE KINNAIRD, Paul Hastings LLP, Washington, DC, for intervenor. Also represented by THOMAS A. COUNTS, IGOR VICTOR TIMOFEYEV.

STEVEN METALITZ, Mitchell, Silberberg & Knupp, LLP, Washington, DC, for amicus curiae Association of American Publishers.

JONATHAN J. ENGLER, Adduci, Mastriani & Schaumberg, LLP, Washington, DC, for amici curiae Motion Picture Association of America, Recording Industry Association of America. Also represented by THOMAS RICHARD BURNS, JR., TOM M. SCHAUMBERG.

GEOFFREY A. MANNE, International Center for Law & Economics, Portland, OR, for amicus curiae International Center for Law & Economics.

ERIC JAY FUES, Finnegan, Henderson, Farabow, Garrett & Dunner, LLP, Washington, DC, for amicus curiae International Trade Commission Trial Lawyers Association. Also represented by MATTHEW BATHON, CHARLES F. SCHILL, Steptoe & Johnson, LLP, Washington, DC; SARAH E. HAMBLIN, Adduci, Mastriani & Schaumberg, LLP, Washington, DC; GOUTAM PATNAIK, GWENDOLYN TAWRESEY, Pepper Hamilton LLP, Washington, DC.

––––––––––––––

Before PROST, *Chief Judge*, NEWMAN, LOURIE, DYK, MOORE, O'MALLEY, REYNA, WALLACH, TARANTO, CHEN, HUGHES, and STOLL, *Circuit Judges.*

PROST, *Chief Judge,* and O'MALLEY, *Circuit Judge*, with whom WALLACH, *Circuit Judge,* joins, concur in the denial of the petitions for rehearing en banc.

NEWMAN, *Circuit Judge,* dissents from the denial of the petitions for rehearing en banc.

PER CURIAM.

# O R D E R

Appellee International Trade Commission and intervenor Align Technology, Inc. each filed separate petitions for rehearing en banc. A response to the petitions was invited by the court and filed by the appellants ClearCorrect Operating, LLC and ClearCorrect Pakistan (Private), Ltd. Several motions for leave to file amici curiae briefs were also filed and granted by the court.

The petitions, response, and briefs of amici curiae were referred to the panel that heard the appeal, and thereafter were referred to the circuit judges who are in regular active service. A poll was requested, taken, and failed.

Upon consideration thereof,

IT IS ORDERED THAT:

The petitions for rehearing en banc are denied.

The mandate of the court will be issued on April 7, 2016.

FOR THE COURT

March 31, 2016
Date

/s/ Daniel E. O'Toole
Daniel E. O'Toole
Clerk of Court

# United States Court of Appeals
# for the Federal Circuit

---

**CLEARCORRECT OPERATING, LLC,
CLEARCORRECT PAKISTAN (PRIVATE), LTD.,**
*Appellants*

**v.**

**INTERNATIONAL TRADE COMMISSION,**
*Appellee*

**ALIGN TECHNOLOGY, INC.,**
*Intervenor*

---

2014-1527

---

Appeal from the United States International Trade Commission in Investigation No. 337-TA-833.

---

PROST, *Chief Judge*, and O'MALLEY, *Circuit Judge*, with whom *Circuit Judge* WALLACH joins, concurring in the denial of rehearing en banc.

We concur in the court's denial of the petitions for rehearing en banc. We write briefly only to address certain points newly raised by the dissent, none of which support its incorrect interpretation of the statute.

First, the dissent cites a hodgepodge of other legislative enactments: a Customs Bureau duty statute, the

Trade Act of 1974, the Arms Export Control Act of 1976, the Bipartisan Congressional Trade Priorities and Accountability Act of 2015, and the Omnibus Trade and Competitiveness Act of 1998. Dissent at 8–12. The dissent's view is that these laws illustrate Congress's intent to account for the advent of things like digital data and electronic transmissions. But these wholly separate statutory regimes have no bearing on Congressional intent regarding Section 337; what Congress has chosen to do in connection with a completely different statute is of little relevance here.[1] And even if we were to accept their relevance to this case, they would prove the *opposite*

---

[1]    For example, the cited decisions by the Court of International Trade and the Department of Labor, which interpret the Trade Act of 1974, have nothing to do with Section 337. Dissent at 8–9. The Trade Act of 1974 was enacted to provide assistance to domestic producers of "articles" whose jobs were being moved abroad. The meaning of the word "article" in this worker-protection context is irrelevant to the question of the ITC's jurisdiction to regulate importation of articles that infringe U.S. patents. Likewise, there can be no question that the cited district court decision interpreting the word "defense articles" in the Arms Export Control Act of 1976 has no bearing on this case. *Id.* at 9–10. Unlike here, the word "defense articles" in the arms context is expressly defined as including "any item or technical data." 22 C.F.R. § 120.6. And the cited decision of the Customs Bureau was about whether software is merchandise that is statutorily subject to import duties. Dissent at 8. That decision has nothing to do with Section 337's regulation of imported articles that infringe U.S. patents; indeed, the Customs Bureau's tasks do not even include making determinations regarding importation of infringing articles.

of the dissent's point—namely, that when Congress wanted to bridge the gap between the non-digital world and the digital world, it did so affirmatively. Congress's failure to do so here supports the conclusion drawn by the panel majority, not the dissent. Moreover, the dissent is wrong to suggest that it falls on us to change the law in order to address changing times. *Id.* at 6–7. Any action on that front must be taken by Congress, not us. *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 430–31 (1984) ("[A]s new developments have occurred in this country, it has been the Congress that has fashioned the new rules that technology made necessary."); *see also Kimble v. Marvel Entm't, LLC*, 135 S. Ct. 2401, 2414 (2015) ("[T]he choice of what patent policy should be lies first and foremost with Congress.").

The dissent also notes that "Section 337 does not depend on the mode of importation; it depends on whether the imported good infringes a patent or copyright or trademark or design." Dissent at 3. The fact that something might infringe a U.S. patent is separate from the question of whether it is an "article." Both of these separate statutory requirements must be met in order for the ITC to exercise jurisdiction. 19 U.S.C. § 1337.

Finally, the dissent lists thirty definitions of "article," each having varying degrees of specificity. Dissent at 16 n.2. While the dissent posits that "[a]ll the definitions define 'article' as distinguishing an item from its class as a whole," *id.* at 16, only a handful of its cited definitions actually do so. And in any event, none of the dissent's definitions are inconsistent with defining "article" as a "material thing." Thus, even with all the definitions brought in at this late stage, the dissent fails to support its overbroad interpretation.

The panel majority was correct in interpreting the word "articles" in Section 337 to mean "material things." That interpretation is the one that is mandated by the

plain meaning of the word, the context of 19 U.S.C. § 1337(a) and the entire statutory scheme, and the legislative history. This court is correct to deny en banc review.

# United States Court of Appeals
# for the Federal Circuit

---

**CLEARCORRECT OPERATING, LLC,**
**CLEARCORRECT PAKISTAN (PRIVATE), LTD.,**
*Appellants*

**v.**

**INTERNATIONAL TRADE COMMISSION,**
*Appellee*

**ALIGN TECHNOLOGY, INC.,**
*Intervenor*

---

2014-1527

---

Appeal from the United States International Trade Commission in Investigation No. 337-TA-833.

---

NEWMAN, *Circuit Judge,* dissenting from denial of rehearing en banc.

Section 337 of the Tariff Act, 19 U.S.C. § 1337, authorizes the International Trade Commission to exclude imports that infringe a United States patent, copyright, trademark, mask work, or design. The Commission requests rehearing en banc of the court's ruling that infringing digital goods that are imported electronically are not subject to exclusion under Section 337 of the Tariff Act. Flaws in this ruling were pointed out at *ClearCorrect, Inc. v. Int'l. Trade Comm'n*, 810 F.3d 1283, 1304

(Fed. Cir. 2015) (Newman, J., dissenting). I write to elaborate on the conflicts that have been created, and to consider the concerns raised by *amici curiae*.[1]

The court's decision is inconsistent with decisions of the Supreme Court, the Federal Circuit, the Court of Customs and Patent Appeals, the Court of International Trade, the Tariff Commission, the Department of Labor, the Bureau of Customs and Border Protection, the Arms Control Export Act, and the Bipartisan Congressional Trade Priorities and Accountability Act. I respectfully dissent.

## DISCUSSION

This court now holds that the Commission has no "jurisdiction" to exclude infringing digital goods that are imported electronically. The court's removal of this jurisdiction conflicts with our recent decision in *Suprema, Inc. v. International Trade Commission*, 796 F.3d 1338, 1350 (Fed. Cir. 2015) (en banc), wherein the court reaffirmed that "the legislative history [of Section 337] consistently evidences Congressional intent to vest the Commission with broad enforcement authority to remedy unfair trade acts." This conflict requires resolution.

The court now holds that the word "article" in Section 337 of the Tariff Act cannot include digital goods, although "article" is the general term used throughout judicial and agency rulings for goods in trade, including digital goods. Digital goods are included in the tariff

---

[1]    *Amicus* briefs supporting rehearing were filed by the International Trade Commission Trial Lawyers Association, the International Center for Law and Economics, the Motion Picture Association of America and the Recording Industry Association of America, and the Association of American Publishers.

laws; they are imported, bought, and sold; they are subject to the patent laws, and have been the subject of many infringement suits. Infringement does not depend on whether the digital goods are carried on a hard substrate, or electronically.

Section 337 does not depend on the mode of importation; it depends on whether the imported goods infringe a patent or copyright or trademark or design. The *amici curiae* point out the consequences of the court's change of law, for infringing imports of books, motion pictures, and other products subject to transmission in digital form. The disruption that this ruling is already causing warrants en banc attention.

# I

### *Section 337 does not distinguish between infringing goods imported electronically and infringing goods imported on a physical medium*

The International Trade Commission applied Section 337 to ClearCorrect's "digital models, digital data, and digital information," produced by ClearCorrect's Pakistani affiliate and transmitted into the United States via the Internet; the Commission found that the patents of the complainant Align Technology were valid, and infringed by the imported digital goods. On appeal, this court held that Section 337 of the Tariff Act of 1930 does not include digital goods that are electronically imported. However, Section 337 is not so limited. The statue provides:

**19 U.S.C. § 1337.  Unfair practices in import trade**

> *(a) Unlawful activities; covered industries; definitions.*

(1)  Subject to paragraph (2), the following are unlawful. . . .

\*\*\*

(B) The importation into the United States, the sale for importation, or the sale within the United States after importation by the owner, importer, or consignee, of articles that—

(i) infringe a valid and enforceable United States patent or a valid and enforceable United States copyright registered under Title 17, United States Code, or

(ii) are made, produced, processed, or mined under, or by means of, a process covered by the claims of a valid and enforceable United States patent.

\*\*\*

(2) Subparagraphs (B), (C), (D), and (E) of paragraph (1) apply only if an industry in the United States, relating to the articles protected by the patent, copyright, trademark, mask work, or design concerned, exists or is in the process of being established.

\*\*\*

Section 337 was first enacted in 1922, to aid in protecting domestic industry against unfair competition from goods imported into the United States. The Senate Report states the purpose:

The provision relating to unfair methods of competition in the importation of goods is broad enough to prevent every type and form of unfair practice and is, therefore, a more adequate protection to American industry than any antidumping statute the country has ever had.

S. REP. NO. 67-595, at 3 (1922).

At the complaint of patentee Align Technologies, the Commission conducted an investigation, reported at *Certain Digital Models, Digital Data, & Treatment Plans for Use in Making Incremental Dental Positioning Adjustment Appliances, the Appliances Made Therefrom, & Methods of Making the Same*, Inv. No. 337-TA-833 (Commission Opinion, April 10, 2014). The Commission found the Align patents valid and infringed, and issued a Cease and Desist Order against

> importing (including through electronic transmission) the digital models, digital data, and orthodontic plans that were found to infringe the Align patents.

Order (April 3, 2014). On appeal, the Federal Circuit reversed the Order, reported at *ClearCorrect Operating, LLC v. Int'l Trade Comm'n*, 810 F.3d 1283 (Fed. Cir. 2015). This reversal has produced many conflicts and concerns, warranting en banc rehearing.

The court's ruling today is the first import distinction depending on the carrier by which the infringing goods are imported.

## II

### *Precedent is uniformly at odds with this court's position*

Our predecessor Court of Customs and Patent Appeals, whose precedent binds the Federal Circuit, recognized the purpose of Section 337 "to give to industries of the United States, not only the benefit of the favorable laws and conditions to be found in this country, but also to protect such industries from being unfairly deprived of the advantage of the same and permit them to grow and develop." *Frischer & Co. v. Bakelite Corp.*, 39 F.2d 247, 259 (CCPA 1930). Over the decades, the International

Trade Commission and the CCPA implemented Section 337 "to provide an adequate remedy for domestic industries against unfair methods of competition and unfair acts initiated by foreign concerns operating beyond the *in personam* jurisdiction of domestic courts.*" Sealed Air Corp. v. Int'l Trade Comm'n*, 645 F.2d 976, 985 (CCPA 1981). The Federal Circuit continued this purpose, stating in *Lannom Manufacturing Co. v. International Trade Commission,* 799 F.2d 1572 (Fed. Cir. 1986), that "the purpose of Section 337 from its inception was to provide relief to United States industry from unfair acts, including infringement of United States patents by goods manufactured abroad." *Id.* at 1580.

The Supreme Court counsels that statutory law should be adapted to its legislative purpose, in the context of advances in technology. In *Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390 (1968), the Court considered "a statute that was drafted long before the development of the electronic phenomena with which we deal here," stating that "[w]e must read the statutory language . . . in the light of drastic technological change." *Id.* at 395–96.

The Court observed in *Twentieth Century Music Corp. v. Aiken,* 422 U.S. 151 (1975), that although Congress did not revise the Copyright Act of 1909 following the advent of radio (and television), "copyright law was quick to adapt to prevent the exploitation of protected works through the new electronic technology." *Id.* at 158. The Court observed the "ultimate aim" of the copyright law "to stimulate artistic creativity for the general public good," and stated that "[w]hen technological change has rendered its literal terms ambiguous, the Copyright Act must be construed in light of this basic purpose." *Id.* at 156.

The patent laws are not limited to the technologies that existed when the Patent Act of 1952 (or any other patent statute) was enacted. And Section 337 is not

limited to the technology of 1930. Computer-implemented digital technology was considered by the Court in *Diamond v. Diehr*, 450 U.S. 175 (1981); and in *Diamond v. Chakrabarty*, 447 U.S. 303 (1980), the Court considered whether the Patent Act included man-made biologic products—although neither technology easily fits the words of any patent statute.

It is now beyond debate that digital goods are subject to the patent law, and it is beyond debate that digital goods can be imported; yet this court holds that infringing digital goods are not subject to the Tariff Act if imported electronically. The court's ruling not only defies the Court's principles, but conflicts with our own precedent, including *Suprema, supra.* In *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1321 (Fed. Cir. 2009), this court rejected the argument that digital goods such as computer software are not a "material or apparatus" and therefore not liable for contributory infringement.

The Commission's ruling in this case is not its first exclusion of infringing digital goods. In *Certain Hardware Logic Emulation Systems*, Inv. No. 337-TA-383, USITC Pub. 3089 (March 1, 1998) the Commission held that "[h]aving found that respondents' software contributorily infringes the claims in issue, we are of the view that our remedial orders must reach that software.*" Id.* at 18. In *Hardware Logic* the Commission stated that "it would be anomalous for the Commission to be able to stop the transfer of a CD-ROM or diskette containing respondents' software, but not be able to stop the transfer of that very same software when transmitted in machine readable form by electronic means." *Id.* at 29.

Section 337 does not determine infringement; its purpose is to regulate unfair competition by infringing imports. The carrier by which the infringing imports arrive in the United States is irrelevant. Contrary to this court's proposition, it is not "regulation of the Internet" to ex-

clude infringing digital goods. As the *amici curiae* point out, this court's ruling has consequences beyond patent infringement, warranting our reconsideration.

### *The rulings of the International Trade Commission comport with the rulings of the Bureau of Customs and Border Protection*

The Customs Bureau held in HQ 114459 (Sept. 17, 1998):

> We further find that the transmission of software modules and products to the United States from a foreign country via the Internet is an importation of merchandise into the customs territory of the United States . . . .

The Customs ruling stated: "The fact that the importation of the merchandise via the Internet is not effected by a more 'traditional vehicle' (e.g., transported on a vessel) does not influence our determination." *Id.* at 2.

It is established that digital products are "goods" and "merchandise" and that their transmission via the Internet is an importation into the United States. It is established that digital goods are subject to the patent law. No authority has held that infringing digital goods that are imported electronically are not subject to the laws of infringement or of importation.

### *The Court of International Trade reached the same conclusion*

The Trade Act of 1974 provides Trade Adjustment Assistance "to workers involved in the production of an 'article' who lose their jobs due to increased competition from 'foreign articles' or due to the shifting of production abroad." *Former Employees of IBM Corp. v. Chao*, 292 F. App'x 902, 904 (Fed. Cir. 2008).

The Court of International Trade, interpreting the word "article" in the Trade Act, explicitly rejected the

argument that software is not an "article" unless embedded in a tangible medium. The court stated, "[t]he plain language of the Trade Act does not require that an article must be tangible." *Former Emps. of Comput. Scis. Corp. v. U.S. Sec'y of Labor*, 30 Ct. Int'l. Trade 124, 130–131, 133 (2006).

### *The Department of Labor reached the same conclusion*

The Department of Labor, interpreting the Trade Act for purposes of Trade Adjustment Assistance, stated that "[s]oftware and similar intangible goods that would have been considered articles, for the purposes of the Trade Act, if embodied in a physical medium will now be considered to be articles regardless of their method of transfer." *IBM Corporation Global Services Division, Piscataway, NJ; Middletown, NJ; Notice of Revised Determination on Remand*, 71 FR 29183-01 (May 19, 2006).

### *The Arms Export Control Act reached the same conclusion*

The Arms Export Control Act (originally enacted as the Foreign Military Sales Act in 1968) prohibits the sale or lease of a "defense article or defense service" unless certain criteria are met. Pub. L. 90-629, § 3(a), 82 Stat. 1320, 1322 (1968) (codified at 22 U.S.C. § 2753(a)). The President is authorized to "designate those items which shall be considered as defense articles and defense services." 22 U.S.C. § 2778(a)(1). The Secretary of State, acting by designation, defined "defense article" as "any item or technical data designated in § 121.1 of this subchapter." 22 C.F.R. § 120.6. "Technical data" is defined to include "[s]oftware . . . directly related to defense articles," as well as "information in the form of blueprints, drawings, photographs, plans, instructions or documentation." 22 C.F.R. § 120.10(a)(1), (a)(4).

Applying this statute to the posting to the Internet of digital plans for 3D printing of gun parts, the court in *Defense Distributed v. U.S. Dep't of State*, 121 F. Supp. 3d 680 (W.D. Tex. 2015) (currently on appeal), observed that digital information is within the meaning of "defense articles."

### *The Omnibus Trade and Competitiveness Act of 1988 reached the same conclusion*

In 1988 Congress reaffirmed the ITC's authority for unfair competition due to imports that infringe patents and copyrights. Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, § 1342(a), 102 Stat. 1107, 1212. The Senate Report explained:

> As indicated by the scope of its language, section 337 was intended to cover a broad range of unfair acts not then covered by other unfair import laws. However, over the years, patent, copyright, and trademark infringement were recognized as unfair trade practices within the meaning of section 337, and today section 337 is predominantly used to enforce U.S. intellectual property rights.

S. REP. NO. 100-71, at 130 (1987). The Omnibus Trade Act reiterated the purpose to provide "a more effective remedy for the protection of United States intellectual property rights" through exclusion of infringing imports. Omnibus Trade and Competitiveness Act, *supra*, § 1341(b), 102 Stat. at 1212. This statute reinforced reliance on Section 337 to exclude infringing imports.

### *The Trade Priorities and Accountability Act of 2015 reached the same conclusion*

In recent trade negotiations, Congress again rejected a distinction between digital goods and the means by which they are transported. The Bipartisan Congressional Trade Priorities and Accountability Act of 2015 covers "digital trade in goods and services" and states that "[t]he

principal negotiating objectives of the United States . . . are . . . to ensure that electronically delivered goods and services receive no less favorable treatment under trade rules and commitments than like products delivered in physical form."  Pub L. No. 114-26, § 102(a)(6), (a)(6)(B)(i), 129 Stat. 320, 325 (2015).

If digital imports were intended to be excluded from Section 337, a statutory change could have been made at least by the Omnibus Trade and Competitiveness Act of 1988, for the digital world was burgeoning.  By 1988, copyright infringement was well understood to include electronic transmissions; for example, during consideration of the Copyright Act of 1976, the House Report stated:

> The corresponding definition of "display" covers any showing of a "copy" of the work, "either directly or by means of a film, slide, television image, or any other device or process." . . . In addition to the direct showings of a copy of a work, "display" would include the projection of an image on a screen or other surface by any method, the transmission of an image by electronic or other means . . . .

H.R. REP. NO. 94-1476, at 64 (1976); *see id.* at 80 ("Unless [excused under some other provision of the Copyright Act] . . . transmission of an image to the public over television or other communication channels, would be an infringement for the same reasons that reproduction in copies would be.").

Congress would not have implicitly excluded known aspects of copyright law when it enacted the Omnibus Trade and Competitiveness Act of 1988 without some statement to that effect.  "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes."  *Whitman v. Am. Trucking*

*Ass'ns*, 531 U.S. 457, 468 (2001). It defies logic to suggest that Congress intended or understood that Section 337, as amended in 1988, would not address all forms of copyright infringement and would exclude electronic transmissions.

The *amici curiae* concerned with copyright state their concern that this court's casual elimination of remedy for Section 337 infringement by goods imported by electronic transmission will have a powerful impact on the importation of books and other publications, as well as on infringing digital imports of motion pictures and other copyrighted material.

## III

### *This entire body of interpretation shows the understanding that "article" is not limited to classical technology*

The Customs Court, now the Court of International Trade, explained that "the word 'article' is itself a nebulous concept seemingly employed in the Tariff Act for the very reason that it possesses an indefinite and neutral meaning." *Close & Stewart v. United States,* 268 F. Supp. 466, 468–69 (Cust. Ct. 1967).

Definitions of "article" in the trade context show the word "article" as a general term for things that are imported. "The word 'articles' when used in a tariff law should be given a broad, liberal meaning . . . ." *G. Hirsch's Sons v. United States,* 167 F. 309, 311 (2d Cir. 1909).

The Court of Customs and Patent Appeals explained that "the word 'articles' is used hundreds of times in most tariff statutes; that Congress clearly meant it to have a broad meaning in some provisions and a restricted meaning in others; and that it has meanings varying with the purposes to be accomplished." *D N & E Walter & Co v. United States*, 44 CCPA 144, 147 (1957). The CCPA stated in *United States v. A. Johnson & Co.,* 588 F.2d 297,

300 (CCPA 1978), that: "In some instances it ['article'] is used as a synonym for 'thing' and embraces any importation, and in other contexts it takes on a narrower meaning."

Section 337 does not define "article," but other sections of the same Tariff Act include an express definition. In *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 860 (1984) the Court looked to an express definition in another section of the same statute for guidance on the meaning of an undefined term, stating: "Although the definition in that section is not literally applicable to the permit program, it sheds as much light on the meaning of the word 'source' as anything in the statute." *Id.* It is highly relevant that Section 332 of the Tariff Act of 1930 states: "The term 'article' includes any commodity, whether grown, produced, fabricated, manipulated, or manufactured." This text also appears in the Tariff Act of 1922, section 318(b).

The Court of Customs and Patent Appeals in 1940, citing Webster's New International Dictionary, explained that, in the Tariff Act of 1930, "Congress said: 'and paid upon all articles when imported from any foreign country.' Unquestionably, Congress meant, by employing that language, to include under the word 'articles' any provided-for substance, material or thing of whatever kind or character that was imported into this country." *United States v. Eimer & Amend*, 28 CCPA 10, 12 (1940).

The Supreme Court, in a case to recover duties paid under protest under an earlier tariff statute, stated, "[i]n common usage, 'article' is applied to almost every separate substance or material, whether as a member of a class, or as a particular substance or commodity." *Junge v. Hedden*, 146 U.S. 233, 238 (1892). The Court, reviewing the variety of uses of the word "article" in the tariff statutes, concluded "[w]e agree with the circuit court that the word must be taken comprehensively." *Id.* at 239.

The Dictionary of Tariff Information, produced by the Tariff Commission (now the International Trade Commission), states that "[t]he word 'article' as ordinarily used in tariff acts embraces *commodities generally*, whether manufactured wholly or in part or not at all." *Articles*, DICTIONARY OF TARIFF INFORMATION (1924) (emphasis added). The same dictionary also states that narrower meanings must arise from context, not from the use of "articles" itself: "The restricted use of the word 'article' has been recognized by the courts and the rule laid down that where an intention appears from the text of the law to give the word 'article' a narrower meaning than it ordinarily has, such meaning shall be applied in the administration of the law." *Id.*

### *The Commission correctly construed the word "articles"*

The Commission stated that "the statutory construction of 'articles' that hews most closely to the language of the statute and implements the avowed Congressional purpose for Section 337 encompasses within its scope the electronic transmission of the digital data sets at issue in this investigation." Comm'n Op. at 36. The Commission concluded that "articles" encompassed all "articles of commerce." The Court defined "articles of commerce" to include pure information, holding in *Reno v. Condon*, 528 U.S. 141 (2000), that the Commerce Clause applies to interstate transmission of information in motor vehicle records sold or released "into the interstate stream of business." *Id.* at 148.

Digital goods did not exist in 1922 and 1930. Nothing in the statute shows an intent to omit later-discovered technologies from Section 337. It cannot have been the legislative intent to lock the statute into antiquity. Unless explicitly provided, statutes are not limited to the circumstances at the time of enactment. *See Diamond v. Chakrabarty*, 447 U.S. at 315 ("This Court frequently has

observed that a statute is not to be confined to the 'particular application[s] . . . contemplated by the legislators.'"). Section 337 was written in broad terms, with no exclusions; the Commission reasonably concluded that Congress did not intend to exclude new fields of technology, and inventions not yet made, from a statute whose purpose is to support invention.

Although digital goods, electronically imported, are not mentioned in the dictionaries of the 1920s, no reason has been shown to exclude them from the "articles" of Section 337. The Commission reasonably and correctly defined "articles" in Section 337 as encompassing all articles of commerce, including digital goods and electronic commerce.

### *This court's reversal of the Commission based on selections from chosen dictionaries cannot be supported*

The words and text of the Tariff Act show that Section 337 is directed to unfair trade practices in importation of articles infringing patents, copyrights, trademarks, mask works, and designs. Nothing in any provision of the Tariff Act suggests an intention to limit "articles" to goods that can be viewed with the human eye or held in the human hand. Digital goods readily fit the purpose and the text of the Tariff Act.

The Commission justly criticizes this court's selection of dictionaries. We undertook to survey the dictionaries of the era, and found forty-five dictionaries in the Library of Congress published between 1900 and 1930, most with multiple definitions of "article." We found twenty-five different entries for the noun form of "article" and thirty

different definitions that could apply to the use of the word "article" in Section 337. [2]

All the definitions define "article" as distinguishing an item from its class as a whole. As expected, the definitions are generally similar; some are nearly identical. Five of the thirty unique definitions use the word "material" or something similar. Three use the phrase "material thing." Nine use the word "thing," but not "material." Three use the phrase "particular thing." Six use the word "commodity." Six use the word "substance." Three use

---

[2] The thirty definitions are: "a particular thing"; "a separate portion of a material thing"; "any particular commodity or material substance (most frequently used of things manufactured, or of things exposed for sale.)"; "a distinct portion or member"; "a material thing, as one of a class"; "an item"; "an individual piece or thing of a class (as, an *article* of food or of dress)"; "a thing, indefinitely (as, what is that *article?*)"; "a commodity"; "a distinct part. Upon each *article* of human duty)"; "a particular commodity, or substance; as, an *article* of merchandise; salt is a necessary *article,* in common usage, this word is applied to almost every separate substance or material"; "a particular object or substance"; "a material thing or class of things; as, an *article* of food"; "something considered by itself and as apart from other things of the same kind or from the whole of which it forms a part"; "a thing of a particular class or kind, as distinct from a thing of another class or kind"; "a separate item"; "a particular commodity"; "particular thing, as the next *a*[rticle]"; "a particular substance"; "a particular thing or class of things"; "a distinct part"; "a particular commodity or substance"; "Separate element or part"; "Something considered by itself"; "a thing of a particular class or kind"; "A separate element, member, or part of anything"; "A distinct part or particular"; "Item"; "a substance or commodity"; "a thing."

the word "item."  Twelve use the adjective "particular" as part of the definition.  A unifying theme of all the definitions is that "article" refers to one of a class of things, and that the nature of the class is defined by context, not by the word "article."

In Section 337(a) the only words modifying "article" are "importation" ("importation of articles"), "sale" ("sale of such articles") and "infringe" ("articles that—infringe"). None of these words mandates a gross materiality that would eliminate digital goods.  In Section 337 the word "articles" is unlimited in any manner that might suggest a narrower meaning, on the customary canons of *ejusdem generis* or *noscitur a sociis*.  We can find no suggestion in the text or context that Congress intended the word "article" to limit Section 337 to goods or technology that existed in 1930.

"After all, what word other than 'articles' could Congress have used if it did want to include intangible things within the scope of the Act?" *Amicus* brief of Int'l. Ctr. for Law and Econ. at 4.  A common sense reading of Section 337, along with the other statutes and regulations reported *supra*, shows the intended breadth of these infringement/importation statutes.

### *The statutory authorization of the cease-and-desist order in 1975 does not mean that digital goods are excluded from Section 337*

The court states that the word "article" cannot include digital goods because the Tariff Act's remedies in 1930 were limited to exclusion orders.  In 1975, Congress amended the Tariff Act to add the remedy of the cease-and-desist order for infringing imports.  The Senate Report states:

> It is clear to your committee that the existing statute, which provides no remedy other than exclusion of articles from entry, is so extreme or in-

> appropriate in some cases that it is often likely to result in the Commission not finding a violation of this section, thus reducing the effectiveness of section 337 for the purposes intended.

S. Rep 93-1298 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7186, 7331. The Report states that "[t]he power to issue cease and desist orders would add needed flexibility." *Id.* The Report states that "[n]o change has been made in the substance of the jurisdiction conferred under Section 337(a) with respect to unfair methods of competition or unfair acts in the import trade." *Id.* at 7327.

Even if it were not practicable to remedy digital importation using the technology of 1930, this cannot mean that digital importation by Internet is immune from the Commission's cease-and-desist authority.

### Infringement does not vary with the carrier into the United States

By its terms, Section 337 is limited to infringing imports. Imports "are the articles themselves which are brought into the country." *Brown v. State of Maryland*, 25 U.S. 419, 437 (1827). Section 337 prohibits "importation . . . of articles that—infringe." The mode of importation, or whether the article passes through a Customs port of entry, does not matter. The Supreme Court has made this clear:

> Importation . . . consists in bringing an article into a country from the outside. If there be an actual bringing in it is importation regardless of the mode in which it is effected. Entry through a customs house is not of the essence of the act.

*Cunard S.S. Co. v. Mellon*, 262 U.S. 100, 122 (1923).

Without doubt, electronically transmitted goods are imported goods, whether or not exempt from import duties. *See* General Note 3(e)(ii), HTSUS (2015) (Rev. 1)

(exempting telecommunication transmissions from import duties); *see also Former Emps.*, 30 Ct. Int'l. Tr. at 131 ("General Note 3(e) supports the conclusion that telecommunications transmissions, which would include transmissions of software code via the Internet, are exempt from duty while acknowledging that they are goods entering into the customs boundaries of the United States."). The Customs agency agrees. *See* HQ 114459 (Sept. 17, 1998) ("We further find that the transmission of software modules and products to the United States from a foreign country via the Internet is an importation of merchandise into the customs territory of the United States").

Section 337 does not concern the imposition of duties for imported software code; it concerns whether infringing digital goods may be imported in violation of valid patents or other property rights. This case is about international trade, not Internet regulation.

### *If there were doubt about the correct interpretation of Section 337, the Commission's reasonable interpretation requires deference*

It is not disputed that the digital data sets and digital models for teeth alignment, produced in Pakistan and imported into the United States, infringe the patents of Align Technology. If this court remains uncertain as to the meaning of Section 337, the Commission's well-reasoned interpretation is entitled to judicial deference. "[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.,* 467 U.S. 837, 843 (1984).

A permissible construction is one that is "rational and consistent with the statute." *Sullivan v. Everhart*, 494 U.S. 83, 88-89 (1990) (quoting *N.L.R.B. v. United Food & Commercial Workers Union, Local 23, AFL-CIO*, 484 U.S. 112, 123 (1987)). "If the agency interpretation is not in

conflict with the plain language of the statute, deference is due." *Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.*, 503 U.S. 407, 417 (1992).

The obligation of deference to the Commission's reasonable statutory interpretation has been recognized by the Federal Circuit. *E.g., TianRui Grp. Co. v. Int'l Trade Comm'n*, 661 F.3d 1322, 1332 (Fed. Cir. 2011) ("We have held that the Commission's reasonable interpretations of section 337 are entitled to deference."); *Kinik Co. v. Int'l Trade Comm'n*, 362 F.3d 1359, 1363 (Fed. Cir. 2004) ("To the extent that there is any uncertainty or ambiguity in the interpretation of § 337(a) and its successor § 1337(a)(1)(B)(ii), deference must be given to the view of the agency that is charged with its administration."); *Enercon GmbH v. Int'l Trade Comm'n*, 151 F.3d 1376, 1381 (Fed. Cir. 1998) ("As the agency charged with the administration of section 337, the ITC is entitled to appropriate deference to its interpretation of the statute.").

"Congress cannot, and need not, draft a statute which anticipates and provides for all possible circumstances in which a general policy must be applied to a specific set of facts. It properly leaves this task to the authorized agency." *Micron Tech., Inc. v. United States*, 243 F.3d 1301, 1312 (Fed. Cir. 2001). To the extent that new technologies are involved in these infringing importations, deference is appropriate to the agency's reasonable application of the statute it is charged to administer. *See Nat'l Cable & Telecomms. Ass'n, Inc. v. Gulf Power Co.*, 534 U.S. 327, 339 (2002) (upholding agency interpretive authority where the statute involved "technical, complex, and dynamic" subject matter that "might be expected to evolve in directions Congress knew it could not anticipate.").

The court offers no explanation, other than to disagree with the Commission, and with every other authority that has interpreted any relevant aspect.

### *Judicial rehearing is appropriate*

This court limits the Tariff Act on the theory that Congress was unaware of digital goods in 1922 and 1930; but the Court "frequently has observed that a statute is not to be confined to the 'particular application[s] . . . contemplated by the legislators.'" *Chakrabarty*, 447 U.S. at 315 (quoting *Barr v. United States*, 324 U.S. 83, 90 (1945)). The *Chakrabarty* Court explicitly rejected the argument that because "genetic technology was unforeseen when Congress enacted § 101" the Court should restrict the statute and await action by Congress. *Id.* at 314. The Court invoked *Marbury v. Madison*, 1 Cranch 137, 177 (1803), stating that "once Congress has spoken it is 'the province and duty of the judicial department to say what the law is.'" *Id.* at 315. The Court stated that "our obligation is to take statutes as we find them, guided, if ambiguity appears, by the legislative history and statutory purpose." *Id.*

The rehearing protocol allows a court to rethink its decision. From my colleagues' denial of the requests for rehearing en banc, I respectfully dissent.